**KENDALL/HUNT PUBLISHING COMPANY, Appellant,**

**v.**

**Neil ROWE, an Individual, and Waveland Press, Inc., a Corporation, Appellees.**

**No. 86–1763.**

Supreme Court of Iowa.

May 11, 1988.

David C. Bauer and James M. Heckman of Bauer & Heckman, P.C., Dubuque, for appellant.

Douglas M. Henry of Fuerste, Carew, Coyle, Juergens & Sudmeier, P.C., Dubuque, and Daniel P. Ernst, Dubuque, for appellees.

Considered by McGIVERIN, C.J., and HARRIS, CARTER, LAVORATO, and ANDREASEN, JJ.

LAVORATO, Justice.

In this case the Kendall/Hunt Publishing Company sued Neil Rowe, a former employee, and Waveland Press, Inc., a competitor in academic publishing, for wrongful disclosure and use of trade secrets; unfair competition and conspiracy to unfairly compete; interference with business contracts; conversion of Kendall's property interest in one of its publications; and breach of Rowe's fiduciary duty and oral employment contract. The dispute arose out of Rowe's activities on behalf of Waveland during and after his employment with Kendall. Rowe allegedly used the knowledge and contacts he gained working for Kendall to recruit authors for Waveland, including ones who had previously published with Kendall.

After a bench trial the district court entered judgment in favor of Rowe and Waveland. Kendall now maintains the court erred by: (1) setting aside Waveland's default for failure to comply with a discovery order; (2) awarding Kendall a smaller amount for fees and expenses than that requested after the default was set aside; (3) dismissing its claim for breach of Rowe's fiduciary duty and employment contract on the ground that it was barred by the statute of limitations; and (4) finding that Rowe and Waveland did not interfere with Kendall's publishing contracts, did not use Kendall's trade secrets, and did not convert Kendall's property interest in a book it had published.

We think, however, that the district court acted properly. Accordingly, we affirm its judgment.

Rowe was employed by Kendall as an associate editor from July 1974 until Febru-

ary 1977, when he resigned. His main duty was to "prospect" among college professors for authors who wanted to publish their materials with Kendall for use primarily in their own classes. Rowe would examine or help to develop manuscripts, analyze the production costs of potential publications, and estimate the demand for these works. Finally, he would submit proposed works to the Kendall home office, where their suitability for publication would be determined; Kendall would generally not publish a work unless the sale of at least 400 copies per year was likely.

In addition, associate editors such as Rowe would compile lists of potential or established authors who might wish to publish with Kendall in the future. Kendall considered these lists to be confidential.

In January 1975 Rowe, his wife, and a Kendall author set up Waveland without informing Kendall. Rowe then began prospecting for both publishers at the same time. He solicited authors for Waveland rather than Kendall when he thought their works would not meet Kendall's suitability standards. Rowe made this determination without checking with the Kendall home office. Kendall representatives first saw a Rowe-edited Waveland book thirty days after Rowe resigned from Kendall in 1977.

A portion of the dispute here resulted from Rowe's dealings with two teams of authors who had published with Kendall before switching to Waveland. Kendall, under its contracts with these teams, had the right of first refusal for printing subsequent editions of the original text.

Nonetheless, one team, Professors Gorden and Miller, contracted with Waveland in 1982 to publish a new edition of their book *Speak Up for Business.* Kendall was notified about this arrangement but did not decide whether to meet Waveland's offer until after Waveland had printed the revised edition.

The other team, Professors Moskowitz and Wright, contracted with Waveland in 1981 for publication of a second edition of their book *Management Science: An Experiential Approach.* When Kendall informed the authors of its intention to exercise its right of first refusal, the authors sent Kendall a Waveland contract to examine. Kendall chose not to meet the contract's terms, and the book was then reprinted by Waveland, though under different terms than those in the contract shown to Kendall. This edition of the book was a photo-reproduction of the Kendall text, with only minor changes.

We describe additional facts of the case as they become relevant to our discussion of the issues Kendall raises.

## I. *Standard of Review.*

We have recently summarized our standard of review in appeals after the bench trial of a law action:

> [T]he trial court's findings of fact have the effect of a special verdict. [These] findings ... are broadly and liberally construed, rather than narrowly or technically. In case of doubt or ambiguity, findings will be construed to uphold, rather than defeat, the judgment. When the trial court ... denies recovery because a party failed to carry the burden of proof on [an] issue, we will not interfere on appeal unless we find the party carried its burden of proof as a matter of law.

*Byers v. Contemporary Indus. Midwest, Inc.,* 419 N.W.2d 396, 397 (Iowa 1988) (citations omitted); *see also* Iowa R.App.P. 14(f)(1) (findings of fact in law action are binding on appellate court if supported by substantial evidence).

## II. *Motion to Set Aside Default.*

Kendall contends that the district court erred in setting aside Waveland's default for its failure to comply with the court's discovery order. The court's ruling was entered following a pretrial hearing on the day scheduled for trial at which Rowe, for the first time, testified as to the bizarre circumstances leading to the default. In its ruling, the court made extensive findings of fact and conclusions of law supporting its decision and with which we agree. We think some discussion of those facts, together with others gleaned from the

record, is necessary to explain the court's ruling.

On June 13, 1984, Kendall filed a motion to compel Rowe and Waveland to answer its interrogatories and requests for production of documents filed the previous February and addressed to each of them separately. On June 20 the court ordered Rowe and Waveland to respond within fifteen days of its order or be subject to sanction.

On June 29 Mark A. Cody, attorney for Rowe and Waveland, wrote his clients advising them of the court's ruling on their special appearance that had been entered more than a year earlier. Accompanying the letter were the interrogatories and request for production addressed to Rowe. Not included were the same documents addressed to Waveland. Six days remained to comply within the June 20 order, but Cody's cover letter made no mention of the deadline. The letter simply admonished Rowe to "respond to [the discovery matters] promptly."

On July 3 Kendall's attorney, at Cody's request, extended the time for responding to its discovery to July 10. Rowe's answers to the interrogatories and his response to the production request were filed July 11. From those documents it appears Rowe swore to them four days earlier, indicating that he had completed his answers within a week of the time he had received them.

Discovering that he had neglected to send Waveland the interrogatories and production request addressed to it, Cody, on July 11, wrote Kendall's attorney about the oversight and assured the attorney he was taking care of it. A week later Cody wrote to his clients, noting the oversight and indicating he had enclosed the documents. Cody wrote further:

> However, I do realize that this is the busy season for you. I believe we have things placated to the point where there is no particular time rush. Therefore, I would request that you look [the interrogatories and production request] over and return them to me at your convenience.

Unfortunately, Cody again neglected to enclose the discovery documents in this last letter, prompting a telephone call from Rowe. On July 25, unbeknownst to Rowe, Kendall's attorney wrote Cody asking for a response to its discovery requests no later than July 31.

On July 27 Cody finally forwarded Rowe the discovery documents but neglected to tell him about the court's original deadline or Kendall's extension to July 31, leaving Rowe with the impression that he could respond to the discovery documents at his convenience. On the same date Cody responded to Kendall's attorney, advised him of the latest oversight, and assured him that the discovery documents had indeed been forwarded to Waveland. Cody further advised the attorney that the July 31 deadline would not be met because of Rowe's out-of-town commitment.

Receiving no response to its discovery requests, Kendall filed a motion for sanctions on August 14, seeking default judgment and reasonable attorney fees because of Waveland's failure to comply with the June 20 order. The motion was set for hearing on August 28. That hearing was continued to October 5.

On September 5 the Honorable Thomas H. Nelson entered Waveland's default of record for failing to comply with his June 20 order. Apparently the judge was not aware the motion for default had been set for October 5 by another judge.

Cody failed to advise his client of the default motion, the hearing setting, or the entry of default.

Finally, on October 4, Cody wrote Rowe a letter simply advising that "[w]e are getting quite a bit of heat to get the answers to interrogatories back from Waveland, and I would appreciate your prompt attention to that matter." Cody also informed Rowe that he was leaving the practice of law in Dubuque and that another attorney would be handling the file. Up to this point Rowe and Waveland had no inkling of any urgency regarding the discovery matters or the default.

The following day, Cody filed a motion to set aside the default. Cody placed the

blame for failure to comply with the June 20 order on himself because of his neglect in not mailing Waveland the discovery documents at the same time similar documents were mailed to Rowe.

Although default had already been entered, Judge Nelson set the August 14 motion for sanctions and the motion to set aside the default for hearing on November 9. On November 8, Daniel P. Ernst, Waveland's new attorney, filed an amendment to the motion to set aside the default. Among other things, the amendment alleged that Waveland had filed the answers to interrogatories and response to production. The verification indicates that Waveland answered the interrogatories on October 9, about a month before they were filed.

Nevertheless, on November 13 Judge Nelson overruled the motion, apparently on the basis that as of November 9 Waveland had not answered the interrogatories. Ernst then filed a motion to reconsider, noting that the court apparently was not aware that Waveland had filed the answers to the interrogatories and response to request for production on November 9. Kendall resisted, contending that the court was indeed aware the answers were filed because their deficiencies were argued at the November 9 hearing. In his ruling setting aside the default, the Honorable Robert J. Curnan found that Kendall's allegation was contrary to Judge Nelson's November 13 finding that the answers had not been filed.

On December 5 Judge Nelson overruled the motion to reconsider.

Reluctantly, Judge Curnan set aside the November 13 order of default. He did so after being satisfied that had the entire record been before Judge Nelson, the default would likely not have been entered.

On appeal Kendall focuses on Iowa Rule of Civil Procedure 236, which permits the court to set aside a default on a showing by the movant of one or more of the following five grounds: (1) mistake, (2) inadvertence, (3) surprise, (4) excusable neglect, or (5) unavoidable casualty.

Rather than focusing on rule 236, Judge Curnan appropriately analyzed the problem from the standpoint of whether the default should have been entered in the first place. He did not consider the September 5 default order as binding because he did not think it was correct. A trial judge may usually correct his or her own rulings or that of another judge of the same court anytime before final judgment. *Avoca State Bank v. Merchants Mut. Bonding Co.*, 251 N.W.2d 533, 539 (Iowa 1977); *State v. Richards*, 229 N.W.2d 229, 232–33 (Iowa 1975).

We thus turn to the question whether the September 5 order was correct. The answer to that question turns on whether dismissal was a proper sanction under the circumstances of this case. *See Krugman v. Palmer College of Chiropractic*, 422 N.W.2d 470, 474 (Iowa 1988).

We do not reverse the district court's imposition of discovery sanctions unless there has been an abuse of discretion. *Sullivan v. Chicago & Northwestern Transp. Co.*, 326 N.W.2d 320, 324 (Iowa 1982). The range of that discretion narrows when the drastic sanctions of dismissal or default are imposed pursuant to Iowa Rule of Civil Procedure 134(b)(2)(C). *Smiley v. Twin City Beef Co.*, 236 N.W.2d 356, 360 (Iowa 1975). Before the district court may impose either sanction, it must find that a refusal to comply was the result of willfullness, fault, or bad faith. *Id.* Usually such a sanction is limited to those situations when a party has violated a district court's order. *Postma v. Sioux Center News*, 393 N.W.2d 314, 318 (Iowa 1986). The rule reflects the "proper balance between the conflicting policies of the need to prevent delays and the sound public policy of deciding cases on their merits." *Edgar v. Slaughter*, 548 F.2d 770, 772 (8th Cir. 1977); *see also Fox v. Studebaker–Worthington, Inc.*, 516 F.2d 989, 996 (8th Cir. 1975).

When faced with a violation of its discovery order, the district court's duty is clear:

Prior to dismissal or entering a default judgment, fundamental fairness should

require a district court to enter an order to show cause and hold a hearing, if deemed necessary, to determine whether assessment of costs and attorney fees or even an attorney's citation for contempt would be a more just and effective sanction. Dismissal and entry of a default judgment should be the rare judicial act. When noncompliance is the result of dilatory conduct by counsel, the courts should investigate the attorney's responsibility as an officer of the court and, if appropriate, impose on the client sanctions less extreme than dismissal or default, unless it is shown that the client is deliberately or in bad faith failing to comply with the court's order.

*Edgar,* 548 F.2d at 773 (interpreting Federal Rule of Civil Procedure 37(b)(2)(A–E)); *see also Societe Internationale v. Rogers,* 357 U.S. 197, 209, 78 S.Ct. 1087, 1094, 2 L.Ed.2d 1255, 1265 (1958) (due process clause of the fifth amendment to the United States Constitution limits the power of courts to dismiss an action without an opportunity for a hearing). This is not to say, however, that the district court may *never* impose sanctions of dismissal or default on a client unless the client has willfully or in bad faith failed to comply with discovery orders of the court. Such an absolute rule would conflict with the well-established rule that clients are responsible for the actions of their lawyers and in appropriate circumstances dismissal or default may be visited upon them because of the actions of their lawyers. *See, e.g., Denton v. Mr. Swiss of Missouri, Inc.,* 564 F.2d 236, 240–41 (8th Cir.1977) (interpreting *Edgar* as merely suggesting that, absent bad faith on the part of the client, other sanctions should be considered; dismissal was not precluded as a sanction); *see also Krugman,* 422 N.W.2d at 474 (attorney's violation of three discovery orders together with his long record of procrastination and inattentiveness resulted in dismissal of client's petition).

▆ With these principles in mind, we turn to the record in this case as it existed on September 5 when the default was entered. We note first that the motion for sanctions was set for hearing for October 5. Yet, without affording Waveland a hearing, the court entered the default. The motion for sanctions does not allege nor did the district court find that Waveland's failure to comply was the result of its or its attorney's willfulness, fault, or bad faith.

A hearing would likely have brought *all* the circumstances to light. Given Cody's inattentiveness and a lack of fault on the part of Waveland, the court would likely have entered appropriate sanctions against the attorney rather than a default against Waveland. Moreover, the hearing would probably have resulted in an earlier filing of the discovery responses given Rowe's promptness when truthfully informed as to the need for promptness.

We agree with Judge Curnan that the "delayed filing in this case was not due to [Waveland's] willfulness, fault or bad faith. Rather, the delays and failure to file timely were the result of advice or lack of advice from its counsel, solely, under the present record." In these circumstances we cannot say that the district court abused its discretion in setting aside the default order as erroneous. Our conclusion is not too surprising in view of our earlier ruling that "[t]he appropriateness of the sanctions imposed, upon which review is sought, is certainly not free from doubt." [1]

### III. *Attorney Fee Sanction.*

▆ In its order setting aside the default the district court determined that Waveland's attorneys, Cody and Ernst & Cody, P.C., should pay, as a sanction, Kendall's reasonable expenses including attorney fees occasioned by the failure to comply with the June 20 order. Kendall sought $4,371.80. That figure included attorney fees for one and one-half days of trial incurred by Kendall because of a mistrial following the court's order setting

---

1. Waveland filed an application for interlocutory appeal, which we denied on January 10, 1985.

aside the default, copying costs occasioned by the default issue, time spent by two Kendall officers to attend trial on April 9 and 10, and attorney fees incurred for a reply to a resistance to Kendall's application for expenses. The district court allowed $632.50, which Kendall contends is grossly inadequate.

The sanction imposed against Waveland's attorneys was an appropriate one under Iowa Rule of Civil Procedure 134(b)(2). The question we need decide is whether the district court abused its discretion in fixing the amount of sanction at $632.50. *See Sandhorst v. Mauk's Transfer, Inc.*, 252 N.W.2d 393, 399 (Iowa 1977). We conclude it did not.

We agree with Waveland that sanctions under rule 134(b)(2) should serve a three-fold purpose: (1) to insure that a party will not profit from its failure to comply, (2) to provide a specific deterrence and to seek compliance with the court's discovery order, and (3) to provide deterrence in the instant case and in litigation generally. *See* 10A *Federal Procedure, Lawyers Edition* § 26:526, at 183 (1988) (discussing purposes of sanctions under Federal Rule of Civil Procedure 37); *see also R.E. Morris Invs., Inc. v. Lind,* 304 N.W.2d 189, 191 (Iowa 1981) (Iowa Rule 134(b)(2) mirrors federal rule 37, and cases under rule 37 are persuasive authority). The record is devoid of any evidence that Waveland or its attorneys profited or intended to profit by their failure to comply.

Specific deterrence and compliance with the court's order was accomplished before the court even ruled on the application for expenses. The answers to the interrogatories and the response to the request for production were filed November 9, eight months before the court ruled on the application for expenses. In addition, there is no evidence that Waveland's attorneys thereafter procrastinated in the litigation.

Kendall complains because the district court did not indicate in its order how it arrived at the amount of the sanction. The short answer to this complaint is that Kendall did not file a motion to enlarge the district court's findings under Iowa Rule of Civil Procedure 179(b). *See Green v. Iowa Dist. Court,* 415 N.W.2d 606, 609 (Iowa 1987). Without more specific findings we are hard pressed to find an abuse of discretion. *See id.*

Moreover, Kendall has the burden to prove that the services were occasioned by Waveland's failure to comply with the June 20 discovery order and that the charges were reasonable in amount. *Cf. Green,* 415 N.W.2d at 608. In this respect we note that Kendall failed to demonstrate specifically how any of the time charges were made necessary by the violation of the discovery order. More than half of the expenses claimed is for time and expenses at trial on April 9 and 10. According to the court's order setting aside the default, a continuance of trial was made necessary not only because of the default removal but also because of Kendall's motion to amend. The court noted both matters would require a trial continuance because of the need for further discovery.

## IV. *Statute of Limitations Defense.*

On October 31, 1985, Kendall filed an amended petition. In addition to the claims of the original petition, it asserted that Rowe had breached his oral employment contract and duty of loyalty by working for Waveland while still employed by Kendall.

The district court found that although Rowe was indeed bound by the duties of a fiduciary, Kendall was barred from asserting a breach of those duties because its claim was filed beyond the five-year limitation period. The court said "that as of March 30, 1977, [Kendall] was aware through its employees ... that Rowe had published at least one [Waveland] work while employed by [Kendall]."

The employees whom the court referred to were Alan Vincent, the Kendall editorial director and director of marketing, and Michael Blase, an associate editor. Blase testified that he and Vincent saw a Rowe-edited Waveland book in a bookstore on March 30, 1977, about thirty days after Rowe's resignation from Kendall:

Q. ... How did it come to be that you saw the book? A. Al Vincent picked it

up, and Al showed me the book and he took a look at it and Al told me that this was a book done by Neil Rowe.

... Then he opened up the cover and showed me it was Waveland Press. Since this was after Neil's leaving I also became aware of the fact that it was Neil's book because I recognized Waveland Press.

Vincent testified that he had no recollection of this conversation with Blase. Nevertheless, the record shows that the two men immediately told a Kendall regional manager about the book.

The district court found that Blase's and Vincent's awareness of the book's existence gave Kendall notice that Rowe had been acting adversely to Kendall's interests while still in its employ, since the production process for the book had begun at least sixty days before Rowe's resignation. Applying the discovery rule, the court determined that the fiduciary duty claim was filed "more than five years after [Kendall] was put on inquiry concerning Rowe's lack of loyalty." It concluded that the claim was barred because it was filed outside of the statutory period.

Kendall now asserts that the district court erred because the evidence was not sufficient to put Kendall on notice in March 1977 that Rowe might have breached his fiduciary duties. Rowe contends the court's conclusion was supported by substantial evidence, and we agree.

■ To begin, the parties do not dispute the district court's finding that Rowe was bound by the duties of a fiduciary. We have previously used the definition of a fiduciary relationship set out in the Restatement (Second) of Torts (1979):

"A fiduciary relation exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation."

*Kurth v. Van Horn,* 380 N.W.2d 693, 695 (Iowa 1986) (quoting Restatement section 874 comment a). " 'Such relationship exists when there is a reposing of faith, confidence, and trust, and the placing of reliance by one upon the judgment and advice of the other.' " *Id.* at 695–96 (quoting *Black's Law Dictionary* 564 (5th ed. 1979)). Given that Kendall relied on Rowe's judgment and advice in finding prospective authors and working with existing ones, we think substantial evidence supports the district court's finding that a fiduciary relationship existed.

Since a claim regarding Rowe's fiduciary duties was practicable, we must next decide whether such a claim was asserted in a timely fashion. The limitation period for this type of action is five years. *See* Iowa Code § 614.1(4) (1985).

In determining whether Kendall's claim was brought within the five-year limitation period, the district court applied the discovery rule. Under this rule, the statute of limitations begins to run when the injured party discovers or in the exercise of reasonable care should have discovered the allegedly wrongful act. *Franzen v. Deere & Co.,* 377 N.W.2d 660, 662 (Iowa 1985); *accord Sparks v. Metalcraft, Inc.,* 408 N.W. 2d 347, 351 (Iowa 1987).

Neither the district court nor the parties, however, cite any authority for applying the discovery rule to this particular type of claim. For the purposes of our discussion, we will assume, without deciding, that the discovery rule does apply here.

"The party pleading an exception to the normal limitations period has the burden to plead and prove the exceptions." *Franzen v. Deere & Co.,* 334 N.W.2d 730, 732 (Iowa 1983); *accord Sparks,* 408 N.W.2d at 350. The issue facing us, then, is whether the district court correctly determined that Kendall did not satisfy its burden of proving its discovery-rule exception to Rowe's statute of limitations defense. *See Franzen,* 334 N.W.2d at 732.

We hold that substantial evidence supports the district court's determination. In *Franzen* we said that under the discovery rule, the limitations period begins when a claimant has knowledge sufficient to put that person on inquiry notice. 377 N.W.2d at 662. This notice creates a duty to make a reasonable investigation to ascertain the exact nature of the problem. *Id.* "[T]he

duty to investigate does not depend on exact knowledge of the nature of the problem that caused the injury. It is sufficient that the person be aware that a problem existed." *Id.*

Was Kendall aware, more than five years before the filing of its claim, that some problem with Rowe's fiduciary duties existed? We think it was, notwithstanding Kendall's assertion that it did not learn of a potential breach of loyalty until Rowe's deposition testimony in 1985.

Rowe's fiduciary relationship with Kendall can be characterized as an agency because he was continuously subject to the will of Kendall. *See* Restatement (Second) of Agency § 1 comment b (1958). For example, all final decisions about publishing particular works were made by the Kendall home office. As the district court properly found, Rowe as an agent was therefore obligated to represent only Kendall and not any adverse party, and to refrain from competition with Kendall in the publishing field. *See* Restatement (Second) of Agency §§ 387, 391, 393.

We think, for several reasons, that when Blase and Vincent discovered the Rowe-edited book in March 1977, Kendall was put on inquiry notice of problems with Rowe's fiduciary duties. First, they identified Rowe by name as the editor on the day they found the Waveland book. Second, as editorial employees with knowledge of the publishing field, they should have known that the production process for the book had begun at least ninety days earlier, or two months before Rowe's resignation from Kendall. Third, Blase and Vincent undoubtedly knew that Rowe had engaged in duties, as editor of the Waveland book, that duplicated his duties for Kendall. And last, as upper-level Kendall employees, Blase and Vincent could easily have initiated a further investigation if the facts above left any doubt that Rowe had apparently breached his fiduciary duties.

In summary, we think substantial evidence shows that in March 1977 Kendall was put on inquiry notice of Rowe's apparent breach. Kendall failed to show that the limitation period should have begun later. Accordingly, we affirm the district court's conclusion that this claim was barred by the statute of limitations.

## V. *Interference With Contractual Relations Claim.*

Two counts of Kendall's petition allege interference with contractual relations based on Rowe's conduct individually and as an officer of Waveland. Two publishing agreements are the subject of these allegations. The first is an agreement dated June 22, 1976, between Kendall and authors Moskowitz and Wright for the publication of their book, *Management Science: An Experiential Approach.* The second is an agreement dated August 25, 1976, between Kendall and authors Gorden and Miller for the publication of their book, *Speak Up For Business.*

The district court concluded that Kendall had failed to establish that Rowe and Waveland had interfered with the contracts in such a manner as to cause either team of authors to breach its contract with Kendall. Kendall contends this was error because the evidence established, as a matter of law, such interference with its right of first refusal.

Tortious interference with an existing contractual relationship consists of the following elements: (1) the existence of a valid contractual relation, (2) knowledge of the relationship, (3) intentional interference inducing or causing a breach or termination of the relationship, and (4) resultant damage to the party whose relation has been disrupted. *C.F. Sales, Inc. v. Amfert, Inc.,* 344 N.W.2d 543, 555 (Iowa 1983). The decisive issue here is whether the evidence establishes as a matter of law that any conduct on the part of either Rowe or Waveland was the cause of either team's alleged breach of the right of first refusal provision.

■ Before one can be liable for interference with a contract, the person must be shown to have caused the interference. W.P. Keeton, D.B. Dobbs, R.E. Keeton & D.G. Owen, *Prosser and Keeton on Torts* § 129, at 989 (5th ed. 1984); Restatement (Second) of Torts § 766 comment o. The rules of legal causation, that is proximate cause, apply. *See* Restatement § 766 comment o, §§ 546–548, §§ 435–461; *Prosser* § 129, at 989–91.

Proximate cause, of course, is a fact question and only in exceptional cases is it decided as a matter of law. Iowa R.App.P. 14(f)(10). Proximate cause may be decided as a matter of law only when "the facts are clear and undisputed and relation to cause and effect so apparent to every candid mind that but one conclusion may be fairly drawn." *Oak Leaf Country Club, Inc. v. Wilson*, 257 N.W.2d 739, 746 (Iowa 1977).

When deciding an issue of proximate cause, a fact finder employs a two-part test: (1) but for the defendant's conduct, the plaintiff's damages would not have occurred; and (2) the defendant's fault must be a substantial factor in bringing about the plaintiff's harm. *Pedersen v. Kuhr*, 201 N.W.2d 711, 713 (Iowa 1972); *accord Johnson v. Junkmann*, 395 N.W.2d 862, 865 (Iowa 1986). "Substantial factor" means that the defendant's conduct has such an effect in producing harm as to lead a reasonable person to regard it as a cause. *Pedersen*, 201 N.W.2d at 713.

■ On the issue of causation, the district court found that:

Moskowitz/Wright and Gorden/Miller had existing contracts with Kendall which had been largely fulfilled. Both were looking toward printing their books again which would require a new contract even if they remained with Kendall. Each [team] of authors had an original contract with Kendall containing a right of first refusal concerning future print-

ings of the book. In both situations, the authors approached Waveland about publishing the book as opposed to Waveland approaching the authors.

There is no substantial evidence that Rowe or Waveland, after making the initial offer [which they had a right to do] to [each author team], did anything to dissuade either [team] from further conversation with Kendall or from subsequently contracting with Kendall.

There is evidence in the record that both [teams] were dissatisfied with Kendall prior to ever contacting Waveland/Rowe regarding publication of their books. The evidence suggests that any lack of communication between the authors and Kendall arose, not out of Rowe's/Waveland's conduct, but out of the deteriorated relationship between the authors and Kendall which predated any offer made by Rowe/Waveland.

Our careful review of the record convinces us that there is substantial evidence to support these findings. Based on these findings the district court concluded that Kendall failed to establish that Rowe and Waveland had interfered with either contractual relationship, a conclusion with which we agree. Of course, this conclusion is antithetical to Kendall's contention that the interference was established as a matter of law.

VI. *Misappropriation of Trade Secret.*

■ Another issue Kendall raises is whether its list of authors, some of whom published with Waveland, was a trade secret that was misappropriated by Rowe and Waveland. The district court found that the list was not a trade secret, and again we agree.

In *Basic Chemicals, Inc. v. Benson*, we said that the elements of a claim based on misappropriation of a trade secret are: "(1) existence of a trade secret, (2) acquisition of the secret as a result of a confidential relationship, and (3) unauthorized use of

the secret." 251 N.W.2d 220, 226 (Iowa 1977). The plaintiff has the burden of proving each of these elements by a preponderance of the evidence. *Id.*

In general a trade secret " 'may consist of any ... compilation of information which is used in one's business, and which gives [one] an opportunity to obtain an advantage over competitors who do not know ... it.' " *Id.* (quoting Restatement of Torts § 757 comment b (1939)). A trade secret is used continuously in the operation of one's business. *Id.*

While an exact definition of a trade secret does not exist, certain factors may indicate whether information is a trade secret:

> (1) the extent to which the information is known outside of [the] business; (2) the extent to which it is known by employees and others involved in [the] business; (3) the extent of measures taken ... to guard the secrecy of the information; (4) the value of the information [to the business and its competitors]; (5) the amount of effort or money expended ... in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Id.*

It is clear that the district court was correct in finding that the identities of current Kendall authors could not be trade secrets because they are openly disclosed to the public. *See id.; Prosser* § 130, at 1022 & n. 71 (requirement of secrecy). Hence, we need only consider whether a list of people who *might* wish to publish with Kendall is a trade secret.

■ We do not doubt that the identities of such people are not readily available to the public. It may even be the case that these identities are not generally known to Kendall employees. While such concealment may make these identities "secrets," we do not think they are *trade* secrets.

A trade secret "differs from other secret information in a business ... in that it is not simply information as to single or ephemeral events in the conduct of the business...." Restatement of Torts § 757 comment b. As the district court found, however, the information on Kendall's list is constantly changing, with names frequently being added or dropped. Such a list is not the sort of definite information to which we have previously afforded trade-secret protection. *See Basic Chemicals,* 251 N.W.2d at 227–30 (chemical formulae; price and customer lists). The information on this list is, instead, ephemeral.

Another factor to consider is the value of the information to the business and its competitors. *See Basic Chemicals,* 251 N.W.2d at 226. We think Kendall's list is of uncertain value, even to Kendall. According to Kendall's brief, some of its so-called "prospects" are "not necessarily interested in writing a book at the present time." In other words, these people "have no existing relationship to [Kendall] except that [it] hopes ... they will someday publish with [Kendall]," as the district court put it. In view of this nebulous relationship, we do not think these people can accurately be called "prospects." A list of their names certainly does not have the definite value generally required of a trade secret. *Cf. Basic Chemicals,* 251 N.W.2d at 228 (list of customers who actually made purchases); *Surgidev Corp. v. Eye Technology, Inc.,* 648 F.Supp. 661, 680–81, 692 (D.Minn.1986) (list of actual users of plaintiff's product).

Finally, we consider the difficulty with which a competitor could acquire the information on Kendall's list. *See Basic Chemicals,* 251 N.W.2d at 226. Given the vague standards for inclusion on this list, we think it is not only of uncertain value, but also of indefinite scope. It would not seem to be very difficult to compile a list of professors who *might* want to publish a book in the future.

In short, we cannot say that the district court's decision on this issue was wrong as a matter of law. Indeed, it was supported by substantial evidence, and we affirm it.

## VII. *Conversion Claim.*

Last, Kendall contends the district court erred in concluding that the design and layout of a book are not the types of property to which the tort of conversion applies.[2] Kendall argues that Rowe and Waveland converted the design and layout of its book *Management Science: An Experiential Approach* when they camera-copied and re-published it. We think the district court was correct, and we affirm its decision.

 Conversion is the act of wrongful control or dominion over another's personal property in denial of or inconsistent with that person's possessory right to the property. *Welke v. City of Davenport,* 309 N.W.2d 450, 451 (Iowa 1981); *Jensma v. Allen,* 248 Iowa 556, 562, 81 N.W.2d 476, 480 (1957); 18 Am.Jur.2d *Conversion* § 1, at 145–46 (1985). The interference must be so serious that the actor may justly be required to pay the other the full value of the property. Restatement (Second) of Torts § 222A(1); *Prosser* § 15, at 90. Among the factors to be considered in determining the seriousness of the interference are

(a) the extent and duration of the actor's exercise of dominion or control;

(b) the actor's intent to assert a right in fact inconsistent with the other's right of control;

(c) the actor's good faith;

(d) the extent and duration of the resulting interference with the other's right of control;

(e) the harm done to the chattel;

(f) the inconvenience and expense caused to the other.

Restatement (Second) of Torts § 222A(2).

We think the district court's analysis shows a proper application of the Restatement factors:

[Kendall] was never deprived [of] the use of its design and layout of *Management Science* by either Rowe or Waveland. No harm was done to their design and layout.... Their control of the layout ... was never removed from them.

It is true that [Rowe and Waveland] made use of [Kendall's] design and layout but this usage was not incompatible with [Kendall's] own continuing usage.

In addition, given the industry-wide practice of camera-copying books, which Kendall itself engaged in, we think Rowe and Waveland were acting in good faith when they reproduced the Kendall composition.

In summary, we agree with the district court that the law of conversion does not apply to the design and layout of printed material.

## VIII. *Disposition.*

We have not ignored Kendall's other contentions but to detail them would unnecessarily extend this opinion further. We have considered them and find them either moot or without merit.

Finding no error, we affirm.

AFFIRMED.

---

**2.** Rowe and Waveland reply that not only was the district court correct but also that federal copyright law preempts a common law conversion claim here. *See* 17 U.S.C. § 301(a) (1976).

Kendall's publishing contract gave the authors the copyright over the literary content of the book. Therefore, the only possible copyright issue would involve the book's design and layout.

We need not address such an issue. A copyright issue was not raised in the pleadings, and, consequently, the district court did not address such an issue in its decision. Hence, in resolving the conversion claim, we assume, without deciding, that federal copyright law does not preempt this claim.