**DIVERSIFIED FASTENING SYSTEMS, INC., an Iowa Corporation, and Diversified Manufacturing, Inc., an Iowa Corporation, Plaintiffs,**

v.

**Douglas A. ROGGE, Peter Greuel, and Sanko Fastem U.S.A., Inc., Defendants.**

No. C 91–2017.

United States District Court, N.D. Iowa, E.D.

March 26, 1991.

Order on Motion for Clarification May 20, 1991.

Kevin J. Visser, Cedar Rapids, Iowa, Thomas M. Cunningham, G. Brian Pingel, Des Moines, Iowa, for plaintiffs.

Mark L. Zaiger, Kurt L. Kratovil, Cedar Rapids, Iowa, for defendants Douglas A. Rogge and Peter Greuel.

Thomas D. Waterman, Richard A. Davidson, Des Moines, Iowa, for defendant Sanko Fastem U.S.A., Inc.

## ORDER FOR PRELIMINARY INJUNCTION

HANSEN, District Judge.

This matter is before the court on plaintiffs' motion for preliminary injunction, filed February 8, 1991. On February 11, 1991, this court entered a temporary restraining order in this matter. The temporary restraining order was extended to midnight March 26, 1991, upon the joint application of the parties to extend the temporary restraining order. *See*, order, filed February 19, 1991. This matter came before the court for hearing on the motion for preliminary injunction at 8:00 a.m. on Monday, March 25, 1991.

*Findings of Fact*

1. Plaintiffs (hereinafter "DFS") are Iowa corporations with their principal place of business at Charles City, Iowa. Plaintiffs are engaged in the manufacturing and marketing, on a national basis, of steel anchors (fasteners) for concrete walls and slabs in the construction industry. Plaintiffs' primary markets are independent hardware stores and lumberyards. Plaintiffs also make sales to chain stores. Recently, plaintiffs have directed some marketing efforts to end-use customers, primary utility and cable companies.

2. The structure of plaintiffs' sales force is as follows. The director of marketing is the top marketing official, immediately under the president of the company, Daniel Crawford. Under the director of marketing are two divisional managers or national sales managers, divided into west and east. Under that level are the regional managers for six regions. Some regions have a regional sales manager, who report to the regional manager. The bottom tier consists of the territory managers. There are approximately forty-five to fifty-five people total in the sales hierarchy.

3. Defendant Rogge, a Texas citizen, held the position of director of marketing for DFS until he unexpectedly resigned on January 7, 1991. Mr. Rogge resigned because of either an actual or perceived decrease in his compensation, primarily in his bonus. Other factors which may have contributed to his resignation were his belief that the quality of DFS products was declining and his belief that the president of DFS, Daniel Crawford, intended to eliminate the entire sales force, or at least the regional managers. In the position of director of marketing, Mr. Rogge was privy to DFS's trade secrets, patent ideas, product development plans, and marketing strategies, both present and future. He has detailed knowledge of DFS's pricing policies, costs, procurement procedures, customer lists, and national sales staff strength and weaknesses. In the year before his departure, Mr. Rogge spent approximately 80 to 85 percent of his time developing new markets for the sale of DFS's products to utility and cable companies.

4. On October 10, 1988, Mr. Rogge and DFS entered into a written Non–Disclosure and Non–Competition Agreement, which provides that, during his employment or following cessation of his employment with DFS, Mr. Rogge would not solicit any client with which he had contact as a result of his employment with DFS, would not engage in any activity or a similar or related business in competition with DFS, and would not solicit directly or indirectly any employee of DFS for employment. *See* defendant's exhibit P. The agreement further provides that Mr. Rogge would not disclose any of plaintiffs' confidential information. *Id.* Mr. Rogge signed the agreement at that time. At the time Mr. Rogge signed the agreement, no official of DFS concurrently signed the agreement on the behalf of DFS. Further, the spaces on the agreement for filling in the geographical and time restrictions for the non-competition provision of the agreement were left blank. Mr. Rogge removed this agreement from his DFS personnel file when he resigned from DFS. At the time Mr. Rogge left DFS, he was earning approximately $85,000 per year.

5. Prior to his departure from DFS, defendant Rogge made copies of the business cards of potential end-user customers, primarily utility and cable companies, which Rogge had pursued on behalf of DFS. Mr. Rogge also took rejected products from DFS's manufacturing facility and may have copied shipment information compiled by Richard Perez, one of the national sales directors. Further, Mr. Rogge asked Mr. Perez to compile a list of DFS's top twenty-six sales people, their territories, and their sales volumes.

6. Defendant Greuel, a Texas resident, was a regional sales manager for DFS prior to his resignation which occurred shortly after Mr. Rogge's. On October 10, 1988, he also entered into a written Non–Disclosure and Non–Competition Agreement with DFS which included terms identical to those of Mr. Rogge's. *See* plaintiff's exhibit 1. Mr. Greuel signed the agreement

at that time. At the time Mr. Greuel signed the agreement, no official of DFS concurrently signed the agreement on the behalf of DFS. Further, the spaces for filling in the geographical and time restrictions for the non-competition provision of the agreement were left blank. After Mr. Rogge and Mr. Greuel had left DFS, officials at DFS filled in a geographical restriction of the United States and a time restriction of two years in the blank spaces therefor on defendant Greuel's agreement, and signed the agreement. Mr. Greuel did not resign the agreement at that time. As a regional manager, defendant Greuel has extensive customer contacts throughout his region.

7. Defendant Sanko Fastem U.S.A., Inc. is a California corporation with its principal place of business in that state. It is owned by a Japanese corporation named Sanko Shoji, Inc., was formed in about 1987, and is a primary competitor of the plaintiffs.

8. There are approximately ten companies which sell concrete fasteners in the United States. All of the companies sell their products nationwide.

9. The products sold by the companies in the concrete fastener industry are relatively fungible. Although the products are not identical from company to company, the products perform substantially the same function in slightly different ways. The direct contact with customers by a company's sales force and the relationship between the sales force and the customer are the most important factors in making sales.

10. Either shortly before or immediately after his resignation from DFS, defendant Rogge was hired by Sanko Fastem, Inc. as a marketing consultant at a rate of $10,500 per month for three months. Defendant Rogge did perform some consulting work for Sanko Fastem prior to the entry of the temporary restraining order. The nature of that work is unclear from the testimony. There is some suggestion in the record that defendant Rogge, prior to the entry of the temporary restraining order, disclosed information to Sanko Fastem regarding at least one product under development by DFS. Plaintiffs' exhibit 3 is a proposed employment agreement, drafted by Mr. Rogge, between Mr. Rogge and Sanko Fastem. It provides for employment commencing April 1, 1991, with an annual salary of $140,000 for the first year and $160,000 for each year for the four following years, plus a bonus and other benefits. There is no direct testimony of record that defendant Greuel has entered into any agreement for either employment or consulting services with Sanko Fastem, although it is likely that he has entered into an agreement similar to that of defendant Rogge.

11. In late December 1990, through January 1991, and into early February, 1991, defendants Rogge and Greuel contacted certain employees of DFS and discussed the possibility of those employees, and other employees, leaving DFS and going to work for Sanko Fastem. Defendants Rogge and Greuel discussed these matters with Douglas C. Pinney, regional sales manager for Region 2 (the position immediately below defendant Greuel), Dwayne Anthony Wohler, regional sales manager in region 5, and Terry Lee Siebersma, regional sales manager for region 1, and with others. From the testimony presented, the court cannot determine whether or not these contacts were unilaterally made by defendants Rogge and Greuel or whether defendants Rogge and Greuel made these contacts at the direction of and with the approval of Sanko Fastem.

12. Defendants Rogge and/or Greuel informed Mr. Pinney that they were developing a marketing plan for Sanko Fastem, that they had been authorized to hire twenty-five salaried employees, that they had contacted several members of the DFS sales force, and that they had received commitments from nine to eleven of the people contacted. Similar information was conveyed to Mr. Wohler by defendants Rogge and/or Greuel.

13. All of the sales force at DFS do not have Non–Disclosure and/or Non–Competition Agreements with DFS. For example, Mr. Wohler, the regional sales manager for region 5, did not have such an agreement.

At least one other Non–Disclosure and Non–Competition Agreement does not have the blanks for geographical and time restrictions filled in. *See* defendant's exhibit RR (Non–Disclosure and Non–Competition Agreements for Richard Perez, National Sales Manager). Also included in exhibit RR are Non–Disclosure and Non–Competition Agreements by William Witherow, regional sales manager, Johnathan Metz, regional manager, Terry Siebersma, regional manager, and Harry Johnson, regional sales manager, all of which contain a geographic restriction of the United States and a time restriction of two years. The court notes that Mr. Siebersma did not sign his agreement. There are two agreements which contain different terms. The agreement for Robert Watson, salesman, contains a time restriction of two years and a geographical restriction of "the geographic area where Employee actually engaged in business, or has business contacts on behalf of Employer." The agreement for Ronald G. Smith, territory manager, has a time restriction of fifteen years and a geographical restriction of the United States. No evidence of when the restrictions were filled in (either at the date appearing of the face of each document or later) was introduced with regard to any of these agreements.

14. Approximately one and a half years ago, a DFS territory manager named Larry Thomas, responsible for eastern Tennessee, was hired by Sanko Fastem. Prior to his departure, the area had $250,000 in annual sales for DFS. After his departure, sales dropped to $30,000 for the whole state of Tennessee.

15. Much of the alleged confidential information regarding DFS customers is readily ascertainable. *See* deposition of Douglas C. Pinney, at 68–69 (price lists for DFS and Sanko are readily obtainable); deposition of Dwayne Anthony Wohler, at 37–38 (names of non-chain hardware stores and lumber yards are readily obtainable from telephone books; prices widely known); 41–43 (same); 50 (nothing he knows, as a regional manager, about the marketing plan is secret); 55 (for the most part, it is just general sales skills that are utilized in selling DFS products).

16. The technical manual prepared by DFS, defendants' exhibit B, is not readily available to competitors.

### Conclusions of Law

1. The court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332, and personal jurisdiction over plaintiffs, defendant Rogge and defendant Greuel.

2. On March 21, 1991, defendant Sanko Fastem moved to dismiss for lack of personal jurisdiction. The resistance period on this motion has not yet expired. Administrative Order 877 refers all motions to dismiss for lack of personal jurisdiction to the Chief Magistrate Judge for hearing and for the issuance of a report and recommended disposition pursuant to 28 U.S.C. § 636(b)(1)(B). The court declines to decide if personal jurisdiction over Sanko Fastem exists at this time. For the purposes of the pending preliminary injunction motion only, the court will assume that it lacks personal jurisdiction over defendant Sanko Fastem. The court makes no statement as to the eventual disposition of the motion to dismiss.

3. In ruling upon plaintiffs' motion for preliminary injunction, this court applies the standard set forth in *Dataphase Systems, Inc. v. C L Systems, Inc.*, 640 F.2d 109 (8th Cir.1981).

[W]hether a preliminary injunction should issue involves consideration of (1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest.

*Id.* at 114.

4. This matter is brought in diversity. Iowa Code § 550.3(1) allows a court to enjoin the actual or threatened misappropriation of trade secrets. "Misappropriation" is defined in part as "[d]isclosure or use of a trade secret by a person who uses improper means to acquire the

trade secret," Iowa Code § 550.2(3)(b), and "[d]isclosure or use of a trade secret by a person who at the time of disclosure or use knows that the trade secret is acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use." Iowa Code § 550.2(3)(d). "Improper means" is defined, in part, as "breach ... of a duty to maintain secrecy." Iowa Code § 550.2(1).

> "Trade secret" means information ... that is either of the following:
>
> > (a) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by a person able to obtain economic value from its disclosure or use.
> >
> > (b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Iowa Code § 550.2(4).

Plaintiffs assert that, in addition to any fiduciary duty established by Iowa Code Chapter 550, the individual defendants owe DFS a common law fiduciary duty to maintain the secrecy of trade secrets and confidential business information.

> A fiduciary relation exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation.

*Kendall/Hunt Pub. Co. v. Rowe*, 424 N.W.2d 235, 243 (Iowa 1988) (quoting *Kurth v. Van Horn*, 380 N.W.2d 693, 695 (Iowa 1986) and Restatement (Second) of Torts § 874 cmt. a (1979)). In *Kendall/Hunt*, the Supreme Court of Iowa found that a fiduciary relationship between an employee and his former employer existed. The court finds that a fiduciary relationship, both under Iowa Code Chapter 550 and the common law, exists between DFS and the individual defendants.

Prior to the adoption of Iowa Code Chapter 550 in April of 1990, a common law action for misappropriation of a trade secret had been defined by the Iowa courts. The court does not decide whether this common law action has been supplanted by Iowa Code Chapter 550, or whether the elements of the tort outlined by the Iowa courts are equally applicable to an action under Chapter 550. The elements of the common law action are "(1) existence of a trade secret, (2) acquisition of the secret as a result of a confidential relationship, and (3) unauthorized use of the secret." *Kendall/Hunt*, 424 N.W.2d at 245–46 (quoting *Basic Chem., Inc. v. Benson*, 251 N.W.2d 220, 226 (Iowa 1977)).

The court finds, based on the evidence presented at the preliminary injunction hearing, that plaintiffs have shown a sufficient probability of success on the merits under Iowa Code Chapter 550 and/or the common law of trade secrets. The individual defendants have had access to confidential customer information of DFS and defendant Rogge has been privy to the development of new products, the development of DFS's marketing strategy and the development of new markets. Although some of this information may be "readily ascertainable by proper means by a person able to obtain economic value from its disclosure or use," Iowa Code § 550.2(4)(a), in particular customer information, the court finds that there is a substantial probability that some of the information obtained by defendants Rogge and Greuel as a result of their employment with DFS are "trade secrets" within the meaning of Iowa Code Chapter 550 and/or the common law.

The court notes that Iowa Code Chapter 550 and the common law protection for trade secrets applies only to prevent the disclosure of trade secrets. It does not apply to prevent competition with an employer, except to the extent that that competition utilizes trade secrets.

5. Defendants make a substantial argument that the terms of defendants Rogge and Greuel's written Non–Disclosure and Non–Competition Agreements with DFS are unenforceable as they did not contain any written geographic or time restrictions at the time each defendant signed them. The court notes that the fact that defendants signed the agreements indicates that some restrictions were contemplated. There was no evidence produced that the terms actually placed in defendant Greuel's

agreement, and which would, in all likelihood have been written into defendant Rogge's agreement, differed from the terms contemplated by the parties at the time each defendant signed his agreement. The court notes that the agreements provide for the issuance of an injunction in the event of a threatened or actual breach of the agreement.

■ "[I]n order to be binding, an agreement must be definite and certain as to its terms to enable the court to give it an exact meaning." *Gildea v. Kapenis*, 402 N.W.2d 457, 459 (Iowa Ct.App.1987) (citing cases). Uncertainty as to any of the essential terms may prevent enforcement of the contract. *Id.* However, uncertainty is a matter of degree, and each case must be decided on its own circumstances. *Id.* Time and place restrictions are certainly essential terms of a covenant not to compete. The court notes that the time and place restrictions apply only to the portion of the agreements regarding non-competition. *See* agreements, para. 1. They do not apply to the non-disclosure portion of the agreements. *See* agreements, para. 2. The agreements do contain a severability clause. *See* agreements, para. 7.

The court further notes several other provisions contained in the agreement at the time defendants Greuel and Rogge signed them. Paragraph 9 of each agreement states that the agreement contains the entire agreement and understanding by and between the employer and employee and that "no representations, promises, agreements or understandings, written or oral, not herein contained shall be of any force or effect." Further, "[n]o change or modification hereof shall be valid or binding unless the same is in writing and signed by the party intending to be bound." Agreement, para. 9. The agreement also provides that:

> In the event that any provision of paragraphs 1 or 2 relating to time period and/or areas of restriction shall be declared by a court of competent jurisdiction to exceed the maximum time period or areas such court deems reasonable and enforceable, said time period and/or

areas of restriction shall be deemed to become and thereafter be the maximum time period and/or areas which such court deems reasonable and enforceable.

Agreements, para. 4B.

■ In light of the failure to specifically delineate the time period and/or areas of restriction, and in light of the language of the agreements, particularly paragraph 4B, the court finds that a reasonable interpretation of the agreement is for the court to determine the maximum time period and geographical restriction which is reasonable and enforceable. The failure to limit the time period and geographical restriction essentially make the contract one imposing a restrictive covenant of unlimited time and space. Such an unlimited covenant is clearly unreasonable and unenforceable. *See Pathology Consultants v. Gratton*, 343 N.W.2d 428, 434 (Iowa 1984) (citing *Ehlers v. Iowa Warehouse Co.*, 188 N.W.2d 368, 373–74 (Iowa 1971)). The court finds that the unlimited time and geographic restrictions currently contained in paragraph 1 of the agreements are unenforceable. The court further finds that it cannot consider the two year and United States provisions unilaterally written into defendant Greuel's agreement to express the intention of the parties or to be binding.

Having so found, the court then must apply the agreed upon procedure in paragraph 4B and determine the maximum time period and geographic restriction which are reasonable and which would be enforceable. This matter will be discussed later in this opinion. The court finds that plaintiffs have shown a sufficient probability of success on their claim of a breach of the Non–Disclosure and Non–Competition Agreements by defendants Rogge and Greuel. There is strong evidence that both defendants Rogge and Greuel have solicited DFS employees. There is also a sufficient probability of success on the enforceability of the non-competition portion of the agreements, following reformation by the court in accordance with paragraph 4B of those agreements.

6. The court finds that plaintiffs face a threat of irreparable harm due to the actu-

al and potential disclosure of their trade secrets, in particular information regarding new product development, new market development strategies, and current customer information. The court also notes the serious loss of business to DFS caused by Mr. Thomas leaving the employ of DFS, obtaining employ with Sanko Fastem, and pirating DFS customers with which he had contacts. The court further finds a threat of irreparable harm exists if defendants Rogge and Greuel solicit either DFS customers or employees.

7. The individual defendants may incur a loss of income if they are not able to be employed by Sanko, or if an injunction which limits their usefulness to Sanko is entered. The court finds that the loss faced by the individual defendants is substantially outweighed by the threat of irreparable harm to plaintiffs.

8. The public policy of many states, including Iowa, is to prevent the unauthorized disclosure of trade secrets. Iowa Code Chapter 550 is an adoption of the Uniform Trade Secrets Act, which has been adopted by 33 states and the District of Columbia. *See* 14 U.L.A. 433 (1990) (table of jurisdictions adopting Uniform Trade Secrets Act). It is also public policy to enforce contracts freely entered into by competent contracting parties, including non-disclosure and non-competition agreements. However, non-competition agreements must be narrowly construed to avoid undue hardship to the employee. Public policy is furthered by issuing the requested preliminary injunction.

9. In deciding whether or not to enforce a restrictive covenant, a three-pronged test is applied by the Supreme Court of Iowa: "(1) [i]s the restriction reasonably necessary for the protection of the employer's business; (2) is it unreasonably restrictive of the employee's rights; and (3) is it prejudicial to the public interest?" *Lamp v. American Prosthetics, Inc.*, 379 N.W.2d 909, 910 (Iowa 1986) (citing cases). The burden of proving reasonableness is on the employer. *Iowa Glass Depot, Inc. v. Jindrich*, 338 N.W.2d 376, 381 (Iowa 1983) (citing *Mutual Loan Co. v. Pierce*, 245

Iowa 1051, 65 N.W.2d 405, 408 (1954)). The "restriction[s] on the employee must be no greater than necessary to protect the employer." *Iowa Glass*, 338 N.W.2d at 381. The restrictive "covenant must not be oppressive or create hardships on the employee out of proportion to the benefits the employer may be expected to gain." *Id.* (citing cases).

The *Iowa Glass* case is particularly pertinent to the facts of this matter. *Iowa Glass* noted that, "[i]n justifying restraints enforced against an employee, [the Supreme Court of Iowa has] often relied upon the employee's close proximity to customers along with peculiar knowledge gained through employment that provides a means to pirate the customer." *Iowa Glass*, 338 N.W.2d at 382 (citing cases). Other factors considered include "the nature of the business itself, accessibility to information peculiar to the employer's business, and the nature of the occupation which is restrained, ... along with matters of basic fairness." *Iowa Glass*, 338 N.W.2d at 382 (citing 54 Am.Jur.2d, *Monopolies, Restraints of Trade, and Unfair Trade Practices*, § 512 at 959 (1971)).

10. The agreements, without the restrictions which were later written in, provide as follows:

A. [F]or a period of ___ years after he ceases to be employed by Employer, Employee shall not, directly or indirectly, solicit business from, divert business from, or attempt to convert to other methods of using the same or similar products or services as provided by Employer, any client, account or location of Employer with which Employee has had any contact as a result of his employment by Employer.

B. [F]or a period of ___ years after he ceases to be employed by Employer, Employee shall not, directly or indirectly, engage in any ___ or similar or related business in competition with Employer within a ___ mile radius of any geographic area where Employer is actually engaged in business, or maintains sales or service representatives or employees.

C. [F]or a period of ___ years after he ceases to be employed by Employer, Employee shall not, directly or indirectly, solicit for employment or employ any employee of Employer.

Agreements, para. 1.

As previously noted, a restriction must be reasonably necessary for the protection of the employer's business and must not be unreasonably restrictive of the employee's rights. *Lamp*, 379 N.W.2d at 910. As noted in the above factual findings, the personal contact with customers is the most important factor in making sales in the concrete fastener industry. Such a restriction, particularly with respect to "clients" and "accounts," is essential for the protection of the employer's business. The restriction does not impinge on a former employee's right to solicit business from customers or potential customers with which he had no contact while employed by DFS. Accordingly, the restrictions placed on an employee by paragraph 1A are reasonable. The court also finds that the restrictions imposed by paragraph 1C are necessary for the protection of DFS's business, do not impinge on a former employee's rights to engage in business in the industry, and are reasonable.

The court does not find paragraph 1B to be reasonable in scope, at least with respect to defendant Greuel. The paragraph as written prevents a former employee from engaging in a similar or related business in the United States, as DFS is engaged in business throughout the United States. Given the nature of the business and the facts of this case, the court finds that it is not necessary for the protection of DFS's business to prevent defendant Greuel from engaging in competition and being employed by Sanko Fastem. It is necessary to prevent defendant Greuel from soliciting away employees of DFS and DFS customers with which he has developed a personal relationship, in addition to preventing the disclosure of any of DFS's confidential information.

11. With respect to defendant Rogge, preventing him from being employed by Sanko Fastem is reasonably necessary to ensure the protection of DFS's business. Rogge was the director of marketing and as such possesses detailed knowledge of new product development, new market development, and DFS's marketing strategy. He was instrumental in developing the utility and cable company market. With respect to defendant Rogge, the only rational way to enforce the Non–Disclosure and Non–Competition Agreement, and to protect DFS's rights under Iowa Code Chapter 550, is to prevent defendant Rogge from being employed by Sanko Fastem. *Cf. Emery Indus., Inc. v. Cottier*, 202 U.S.P.Q. (BNA) 829 (S.D.Ohio 1978) (In situation where employee had signed a non-disclosure agreement but not a non-competition agreement, court found that injunction prohibiting non-disclosure to competitor would be insufficient as the employee could not help but use his confidential knowledge if employed by the competitor). *See also Air Products and Chem., Inc. v. Johnson*, 296 Pa.Super. 405, 442 A.2d 1114 (1982).

12. The non-disclosure portion of the agreements provides that the employee shall not disclose

"confidential information of special and unique nature and value relating to such matters as Employer's trade secrets, patents, systems, procedures, manuals, confidential reports and lists of clients, as well as the nature and type of business conducted and/or other services rendered by Employer, the equipment and methods used and preferred by Employer's clients, and the fees paid by such clients, ... which as been obtained by or disclosed to him as a result of his employment by Employer.

Agreement, para. 2. The time limit established in the agreement is "during or following the term of his employment." However, a non-disclosure agreement is not a covenant not to compete. The court notes that Iowa Code § 550.3(1) provides that "an injunction shall be terminated when the trade secret has ceased to exist. However, the injunction may be continued for an additional reasonable period of time in order to eliminate a commercial advantage that otherwise would be derived from

misappropriation." Iowa Code § 550.3(1). Defendants have made no argument that paragraph 2 of the agreements is invalid because of indefiniteness or uncertainty. Defendants do argue that there are no trade secrets to be protected in this matter. *See* defendants' resistance and trial brief, at 13–17. Defendants rely on the common law definition of trade secret discussed in *Basic Chemicals, Inc. v. Benson*, 251 N.W.2d 220 (Iowa 1977), and the definition in Iowa Code Chapter 550. However, in this matter the duty of non-disclosure and the scope of the information covered is contractually established. The court must look to the definition set forth in the non-disclosure portion of the agreement.

13. The final question remaining is what time restriction is reasonable for the non-competition portion of the Agreement. Paragraph 4B of the Agreement provides for "the maximum time period" which the "court deems reasonable and enforceable." Plaintiffs obviously believe two years to be reasonable. Defendants have not specifically argued that two years is unreasonable. After having considered this matter, the court finds that the preliminary injunction should be granted for the pendency of this litigation, with a maximum limit of two years. The court does not decide whether or not two years is reasonable at this time. Defendants may, in the future, move for a modification of the time limitation if it appears that the time which has passed is unreasonable. The court will place this matter on a fast track for discovery and resolution, so that this matter can be quickly and expeditiously resolved.

## ORDER:

Accordingly, It Is Ordered:

1. Plaintiffs' motion for preliminary injunction, filed February 8, 1991, is granted in part and denied in part. The motion is denied to the extent that it seeks the issuance of a preliminary injunction against defendant Sanko Fastem USA, Inc. The denial of this portion of the motion is without prejudice to its renewal in the event that the court should eventually rule that it has personal jurisdiction over defendant Sanko Fastem USA, Inc.

2. The individual defendant Douglas A. Rogge is hereby preliminarily enjoined and restrained from serving as a consultant, agent, employee or in any capacity whatsoever, of or for the corporate defendant, Sanko Fastem U.S.A., Inc., or any of its affiliated entities, parents, siblings, or subsidiaries during the pendency of this litigation, but not to exceed a period of two years from and after the date of his resignation from plaintiffs' employ. The individual defendants Douglas A. Rogge and Peter Greuel are further enjoined and restrained from, directly or indirectly, soliciting for employment or employing any employee of plaintiffs. The individual defendants Douglas A. Rogge and Peter Greuel are further enjoined and restrained from, directly or indirectly, soliciting business from, diverting business from, or attempting to convert to other methods of using the same or similar products or services as provided by plaintiffs, any client, account or location of plaintiffs with which he has had any contact as a result of his employment with plaintiffs.

3. The individual defendants Douglas A. Rogge and Peter Greuel are each hereby further preliminarily enjoined and restrained during the pendency of this litigation from disclosing to any person or entity any confidential information of special and unique nature and value relating to such matters as Employer's trade secrets, patents, systems, procedures, manuals, confidential reports and lists of clients, as well as the nature and type of business conducted and/or other services rendered by Employer, the equipment and methods used and preferred by Employer's clients, and the fees paid by such clients, which was obtained by or disclosed to him as a result of his employment by plaintiffs, except to counsel as necessary for the conduct of this matter, who shall be governed by the terms of the protective order entered on February 11, 1991.

4. Pursuant to Rule 65(c), Federal Rules of Civil Procedure, plaintiffs shall post security in the amount of $50,000.

5. Upon the posting of the bond herein required, the Clerk shall issue a writ for the preliminary injunction and deliver the same and a copy of this order to the United States Marshal for service upon all defendants. Plaintiffs' counsel shall immediately provide the Marshal with a completed Marshal's Form 285 (Directions for Service) and either pay the costs of service in advance or make satisfactory arrangements with the Marshal for such payment.

Done and Ordered.

## ORDER ON MOTION FOR CLARIFICATION

This matter is before the court on defendants Douglas A. Rogge (Rogge) and Peter Greuel's (Greuel) resisted motion for clarification of order for preliminary injunction, filed April 11, 1991, and defendants Rogge and Greuel's motion for leave to file reply brief, filed May 3, 1991. The motion for leave to file reply brief will be granted.

On March 26, 1991, this court entered a preliminary injunction against defendants Rogge and Greuel. Defendants Rogge and Greuel now ask the court to interpret the scope of that injunction.

■ Defendant Rogge first asks if the injunction prohibits him from establishing a company to wholesale masonry screws. The injunction prohibits defendant Rogge "from, directly or indirectly, soliciting business from, diverting business from, or attempting to convert to other methods of using the same or similar products or services as provided by plaintiffs, any client, account or location of plaintiffs with which he has had any contact as a result of his employment with plaintiffs" and "from disclosing to any person or entity any confidential information of special and unique nature and value relating to such matters as Employer's trade secrets, patents, systems, procedures, manuals, confidential reports and lists of clients, as well as the nature and type of business conducted and/or other services rendered by Employer, the equipment and methods used and preferred by Employer's clients, and the fees paid by such clients, which was obtained by or disclosed to him as a result of

his employment by plaintiffs." Order, filed March 26, 1991, at 24-25. The court declines to determine whether this language in the injunction prevents defendant Rogge from engaging in the business of wholesaling masonry screws. The court leaves that decision to defendant Rogge's discretion based upon his counsel's advice, subject of course to plaintiffs' right to take any action plaintiffs deem necessary if plaintiffs believe that defendant Rogge is violating the terms of the injunction. The court does not have sufficient information, without a detailed evidentiary hearing, to determine if this proposed activity would violate the terms of the injunction. The court declines to hold such a hearing because to do so would result in an essentially advisory opinion.

Defendant Rogge next asks whether the injunction prevents him from being employed by Sanko to develop fastener markets outside of the United States. In answer to this question, the injunction prohibits defendant Rogge "from serving as a consultant, agent, employee or in any capacity whatsoever, of or for the corporate defendant, Sanko Fastem U.S.A., Inc., or any of its affiliated entities, parents, siblings, or subsidiaries during the pendency of this litigation, but not to exceed a period of two years from and after the date of his resignation from plaintiffs' employ." Order, filed March 26, 1991, at 23-24.

■ Defendant Greuel first asks if he is "permitted to hire *former* DFS employees whose employment at DFS terminated prior to any offer (or discussion) of Sanko employment by Defendant Greuel." Reply brief at 3. The injunction prohibits defendant Greuel "from, directly or indirectly, soliciting for employment or employing any employee of plaintiffs." Order, filed March 26, 1991, at 24. The court leaves that decision to defendant Greuel's discretion based upon his counsel's advice, subject of course to plaintiffs' right to take any action plaintiffs deem necessary if plaintiffs believe that defendant Greuel is violating the terms of the injunction. The court does not have sufficient information, without a detailed evidentiary hearing, to

determine if this proposed activity would violate the terms of the injunction. The court declines to hold such a hearing because to do so would result in an essentially advisory opinion.

 Defendant Greuel next asks if he may "market[ ] Sanko fastener products to customers who Defendant Greuel called upon on behalf of DFS and who previously purchased product from DFS but do not currently purchase any product from DFS." Motion for clarification at 3. Third, defendant Greuel asks if he may "market[ ] Sanko fastener products to chain store hardware stores where the only prior contact with the chain store by Defendant Greuel on behalf of DFS took place at an individual local chain store outlet." *Id.* Finally, defendant Greuel asks if he may "market[ ] Sanko fastener products to industrial end-users, such as large multistate general contractors, where Defendant Greuel on behalf of DFS sold DFS product to only one local industrial end-user job site." *Id.* at 4.

With regard to these three proposed activities, the court notes that the injunction prohibits defendant Greuel "from, directly or indirectly, soliciting business from, diverting business from, or attempting to convert to other methods of using the same or similar products or services as provided by plaintiffs, any client, account or location of plaintiffs with which he has had any contact as a result of his employment with plaintiffs." Order, filed March 26, 1991, at 24. The court leaves the decision as to whether he wishes to engage in these activities to defendant Greuel's discretion based upon his counsel's advice, subject of course to plaintiffs' right to take any action plaintiffs deem necessary if plaintiffs believe that defendant Greuel is violating the terms of the injunction. The court does not have sufficient information, without a detailed evidentiary hearing, to determine if the proposed activities would violate the terms of the injunction. The court declines to hold such a hearing because to do so would result in an essentially advisory opinion. The court does not give legal advice.

ORDER:

Accordingly, It Is Ordered:

1. Defendants Douglas A. Rogge and Peter Greuel's motion for leave to file reply brief, filed May 3, 1991, is granted. The clerk of court is directed to detach and file the reply brief.

2. Defendants Douglas A. Rogge and Peter Greuel's motion for clarification of order for preliminary injunction, filed April 11, 1991, is ruled upon in accordance with the text above.

Done and Ordered.