APAC TELESERVICES, INC., an Illinois
Corporation, Plaintiff,

v.

Shawn M. McRAE and Access Direct
Telemarketing, Inc., an Iowa
Corporation, Defendants.

No. C97–183–MJM.

United States District Court,
N.D. Iowa,
Cedar Rapids Division.

Nov. 19, 1997.

854

Kevin H. Collins, Mark L. Zaiger, Shuttleworth & Ingersoll, Cedar Rapids, IA, for APAC Teleservices, Inc.

Ronald L. Saylor, Williamsburg, IA, for Shawn M. McRae.

Patrick M. Roby, Elderkin & Pirnie, P.C., Cedar Rapids, IA, for Defendant Access Direct Telemarketing, Inc.

*OPINION AND ORDER ON PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION*

MELLOY, Chief Judge.

APAC Teleservices, Inc. (APAC) and Access Direct Telemarketing, Inc. (Access Direct) are competitors in the outsource telemarketing industry. In addition to outsource telemarketing, APAC also provides inbound telemarketing services. Access Direct does not currently have an inbound telemarketing operation, but it plans to have one soon. According to Access Direct's Chief Executive Officer, Thomas Cardella, Access Direct had been searching for someone to head up its Inbound department for some time before it hired Shawn McRae as Vice–President in charge of Inbound Telemarketing operations. McRae was working for APAC before he left to take this position with Access Direct.

A simple way of explaining "outsource telemarketing" is that it means that one company makes telephone calls on behalf of another company to generate business. For instance, handling telesales for certain long-distance providers is an example of outsource telemarketing. On the flip side, "inbound telemarketing" means that a company receives incoming calls from customers on behalf of another company. An example of inbound telemarketing is receiving and handling customer services inquiries for another company.

Shawn McRae began working as a technology consultant for APAC in late August or September of 1996. By October, he had moved to APAC's office in Cedar Rapids, Iowa, where he worked in the Information Technology (IT) department as a consultant for a specific project called the "G–Prime Advanced Technology Platform Project for AT & T." In January of 1997 he began working as a full-time APAC employee, continuing his work in the IT department as one of the head "architects" for the ATP Project for AT & T, and on another project using Computer Telephony Integration (CTI). When he became a full-time employee he signed a nondisclosure agreement,[1] and four

_____

1. Testimony at the hearing established that the company which facilitated McRae's work as a

months later, in April of 1997, he signed a restrictive covenant which contained a non-competition agreement. In the beginning of September 1997, McRae left APAC to work for Access Direct.

Both McRae and Access Direct assert that McRae was hired into an operations position at Access Direct, where he will be Vice-President of Inbound Telemarketing. In contrast, APAC claims that McRae's title as Vice-President of Inbound Telemarketing is a cover-up to hide the fact that his job at Access Direct is similar to what he did at APAC, and that Access Direct really hired McRae into a technological position as Chief Information Officer. Because APAC believes that neither McRae nor Access Direct are being forthright about the extent to which McRae's new job is similar to his old job, and because APAC asserts that McRae was privy to APAC trade secrets that would be beneficial to Access Direct, APAC believes it inevitable that McRae will disclose APAC's trade secrets to Access Direct.

APAC therefore alleges various breach of contract claims, including breach of a non-competition agreement and breach of a non-disclosure agreement, as well as violations of the Iowa Trade Secrets Act and tortious interference. APAC seeks a preliminary injunction to bar McRae from employment with Access Direct and to enforce the nondisclosure agreement.

At this stage, the sole issue before the Court is whether to grant the preliminary injunction.

### Background

Companies like APAC, whose livelihood depends on their ability to link their technology with their clients' technology (i.e., APAC's ability to have its computers "talk to" its clients' computers), must work to integrate their existing technology with their clients' technology. One way to achieve this integration is to buy off-the-shelf products which will automatically allow the two systems to talk to each other. Another way is to customize the off-the-shelf products in or-

der to tailor those products to more efficiently serve both companies' needs.

When McRae worked at APAC, he was primarily responsible for two projects involving such integration. His main project was the Advanced Technology Platform (ATP) Project for AT & T. ATP is a personal-computer-based, windows-driven product that allows a telemarketer to broaden the scope of services that it can offer to its customers. What this basically means is that ATP uses an off-the-shelf, windows-driven product to help APAC's technology work with, or talk to, AT & T's technology. In order to do this, the off-the-shelf product must be modified so that it can do the best possible job getting the two systems to work together. McRae was an integral part of the ATP team. He was one of the lead architects in charge of designing necessary modifications to tailor the off-the-shelf products so that they could best serve AT & T's needs. The ATP Project that McRae helped to develop for AT & T was for outbound telemarketing services.

McRae's other project at APAC used Computer Telephony Integration (CTI), which is basically an interface that allows phone systems to talk with computer systems. For example, using the telephone to check the balance of a bank account is one kind of CTI: the customer places a telephone call, and that telephone call connects with a computer where bank account information is located. CTI allows computer systems to launch, transfer, route, or receive telephone calls. It also allows computer applications to receive and use data from telephone systems, such as caller-ID or punched-in numbers. CTI is capable of capturing and reporting the number, type, and results of calls received or launched. When McRae worked at APAC, he spent five or six weeks evaluating vendors, testing different off-the-shelf products, and participating in the selection of vendors for APAC's CTI. This work was primarily geared toward inbound services.

consultant at APAC had signed a nondisclosure agreement with APAC which included the work of its consultants. Thus even when McRae was a

consultant for APAC, and not yet a full-time APAC employee, he was bound by a nondisclosure agreement.

Most of McRae's work at APAC had focused on these two information technology projects, the ATP and CTI, before he left to work for Access Direct.

As Vice–President of Inbound at Access Direct, McRae asserts that his job is radically different than what he was doing at APAC. At APAC he worked in the information technology department and was primarily focused on outbound telemarketing; at Access Direct, he works in an operations capacity focused exclusively on inbound telemarketing. At APAC he helped to select and adapt off-the-shelf products to meet the joint needs of APAC and APAC's clients; at Access Direct he works with clients to decide what kinds of information the clients need to know and how Access Direct can best forecast their clients' needs and provide information back to them. Instead of testing off-the-shelf products and tailoring those products to meet specific client's needs, now all McRae has to do is to tell the IT department what the Inbound department needs to be able to do, and the IT department has sole responsibility to design the solution.[2] In addition, in his new job McRae will determine demographic locations, attendance policies, scheduling, financial budgets, and profit margins. He will also work with other departments, such as IT and human resources, to decide how the Inbound department is going to train its staff, and he will hire and fire employees.

At the hearing on this motion, McRae testified that none of his responsibilities at Access Direct are similar to what he did at APAC, but APAC adamantly disagrees.

## Discussion

### A. Choice of Law

This Court has diversity jurisdiction over this case pursuant to 28 U.S.C. § 1332, so Iowa's choice-of-law rules govern. See Baxter Int'l, Inc. v. Morris, 976 F.2d 1189, 1195 (8th Cir.1992). Because APAC alleges two principal legal issues—breach of contract for the restrictive covenant not to compete, and misappropriation of trade secrets in violating the nondisclosure agreement—a choice of law determination is needed for each legal issue. Ewing v. St. Louis–Clayton Orthopedic Group, Inc., 790 F.2d 682, 686 (8th Cir.1986).

■ First, the Court turns to Iowa's choice-of-law rules to decide whether Illinois or Iowa law should be applied to the breach of contract, noncompetition issue. Under Iowa law, if the parties to a contract have selected the law that will apply to their contract, the court follows a three-step process to determine whether to honor that selection of law. Curtis 1000, Inc. v. Youngblade, 878 F.Supp. 1224, 1253 (N.D.Iowa 1995), citing Baxter, 976 F.2d at 1195–96. The court first determines "which state's law would apply in default under [the most significant relationship analysis] in the absence of an effective choice of law by the parties." Id. Second, it decides "whether the default state has a materially greater interest in the outcome of the particular issue than the chosen state." Id. And last, the court determines "whether application of the law of the chosen state would be contrary to a fundamental policy of the default state." Id.

■ APAC contends, and the defendants have not argued otherwise, that the parties' choice of law, Illinois law, satisfies these requirements. Although Iowa law would apply in default under the most significant relationships analysis, Iowa does not necessarily have a materially greater interest in the outcome than does Illinois, and applying Illinois law would not be contrary to a fundamental policy of Iowa. Taking these factors into consideration, in addition to the fact that the defendants have not challenged APAC's assertion that Illinois law should govern, the Court agrees that Illinois law governs the

---

**2.** The defendants' cross-examination of Raymond Zukowski, who is charge of the inbound division at APAC, illustrates this point:

Q: Isn't it correct, sir, that as the director of inbound, you don't concern yourself with the nuts-and-bolts technology of the hardware and software, correct?

A: Most of the time, you're correct.

Q: You're a customer of theirs, and you go and say, all right, guys, here's what I want to do, this is my objective, go out and find me the hardware and software … tell me if you can do it, is that a fair statement?

A: That's a fair statement.

analysis of the restrictive covenant not to compete.

■ Second, the Court examines Iowa's choice-of-law rules to determine what law applies to the tort of misappropriation of trade secrets (i.e., violating the nondisclosure clause through inevitable disclosure of trade secrets). In a torts case, Iowa courts apply the "most significant relationships" test. *Veasley v. CRST Int'l, Inc.*, 553 N.W.2d 896, 897 (Iowa 1996)(citing Restatement (Second) of Conflicts § 145(1)). Iowa courts usually consider the following factors to determine which state law applies:

(a) the place where the injury occurred;

(b) the place where the conduct causing the injury occurred;

(c) the domicile, residence, nationality, place of incorporation, and place of business of the parties; and

(d) the place where the relationship, if any, between the parties is centered.

*See Veasley*, 553 N.W.2d at 897–98 (citing Restatement (Second) of Conflicts § 145 (1971)).

■ Here, the location of McRae's conduct is primarily Iowa. He has been working in APAC's Cedar Rapids office since October 1996; in September 1997, he left APAC to work for Access Direct, which is an Iowa corporation. APAC contends, and the defendants have not argued otherwise, that because Iowa has the most significant relationships, the Iowa Trade Secrets Act should apply. Having found that most of the conduct at issue for the trade secret misappropriation claims took place in Iowa and that Iowa meets the "significant relationships" test, this Court finds that the Iowa Trade Secrets Act applies.[3]

This Court will thus apply Illinois law to analyze the covenant-not-to-compete issue, and it will apply the Iowa Trade Secrets Act

to analyze the misappropriation of trade secrets claim.

### B. Preliminary Injunction Standards

To decide whether to grant the motion for a preliminary injunction, the Court must consider: (1) the probability that APAC will succeed on the merits; (2) the threat of irreparable harm to APAC; (3) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties; and (4) the public interest. *See Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir.1981)(en banc); *see also Calvin Klein Cosmetics Corp. v. Lenox Labs., Inc.*, 815 F.2d 500, 503 (8th Cir.1987); *Sports Design and Dev., Inc. v. Schoneboom*, 871 F.Supp. 1158 (N.D.Iowa 1995). When weighing these factors, "no single factor is itself dispositive; in each case all factors must be considered to determine on balance whether they weigh towards granting the injunction." *Calvin Klein*, 815 F.2d at 503.

■ The primary function of a preliminary injunction is to preserve the status quo until, upon final hearing, a court may grant full, effective relief, if warranted. *Sanborn Mfg. Co., Inc. v. Campbell Hausfeld/Scott Fetzer Co.*, 997 F.2d 484, 489 (8th Cir.1993). Additionally, where granting the preliminary injunction would grant essentially the same relief that the moving party would obtain if it won at trial, the movant's burden to prove that the balance of factors weighs in its favor is a "heavy one." *See Sanborn*, 997 F.2d at 486, *citing Dakota Indus., Inc. v. Ever Best Ltd.*, 944 F.2d 438, 440 (8th Cir.1991). Ultimately, the Court has discretion to grant or deny the motion, and its decision may not be disturbed absent a clearly erroneous factual determination, an error of law, or an abuse of discretion. *Calvin Klein*, 815 F.2d at 503. With this standard in mind, the Court will

---

3. This Court also notes that even if Illinois law, and not Iowa law, applied to the trade secrets issue, both Iowa and Illinois courts recognize that a plaintiff can prove trade secret misappropriation by proving inevitable disclosure. *See* Iowa Code 550.3(1) (codifying protection against threatened misappropriation) and *PepsiCo, Inc. v. Redmond*, 54 F.3d 1262, 1268–69 (7th Cir.1995)(explaining that the Illinois Trade Se-

crets Act supports the interpretation that a plaintiff may prove a claim of trade secret misappropriation by demonstrating that the defendants' new employment will inevitably lead him to rely on plaintiff's trade secrets). Thus, the Court's analysis and ultimate conclusions for the nondisclosure agreement would have been similar had that issued been analyzed under Illinois law.

analyze each *Dataphase* factor in turn. Within the analysis of each factor, the Court will also examine the noncompetition and nondisclosure issues separately, according to the appropriate choice of law.

### C. Analysis of Dataphase Factors

#### 1. Probability that APAC Will Succeed on the Merits

 In deciding whether to grant a preliminary injunction, the Court's initial estimation of the strength of the plaintiff's case plays a role, but it is not determinative. The probability of success does not require that the party seeking relief prove a greater than fifty percent likelihood that it will succeed on the merits. *Dataphase Sys. Inc.*, 640 F.2d at 113. Instead of a rigid measuring stick, the Court flexibly weighs the particular circumstances of the case to determine "whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." *Calvin Klein*, 815 F.2d at 503, *quoting Dataphase*, 640 F.2d at 113.

#### a. Restrictive Covenant Claim: Breach of Covenant Not to Compete

The noncompetition agreement at issue in this case reads, in pertinent part:

*Non-competition:* Employee covenants that during his employment and for a period of twenty four (24) months after the termination thereof for any reason whatsoever, Employee shall not, directly or indirectly, in the 48 contiguous states of the United States, on his own account, or as an employee ... engage in, or aid or assist anyone in the conduct of a business competitive with that of Employer in which Employee is in (i) a capacity similar to Employee's capacity during his employment with Employer or (ii) a capacity in which it is likely that Employee will disclose Employer's Proprietary Information or Client Information.

Pl.'s Ex. 5, Dep. Ex. 8, ¶ 4.

 Under Illinois law, the question of whether a restrictive covenant is enforceable is a question of law. *Lawrence and Allen, Inc. v. Cambridge Human Resource*

*Group, Inc.*, 292 Ill.App.3d 131, 226 Ill.Dec. 331, 337, 685 N.E.2d 434, 440 (1997)(citing *Corroon & Black of Illinois, Inc. v. Magner*, 145 Ill.App.3d 151, 98 Ill.Dec. 663, 494 N.E.2d 785 (1986)). To be enforceable, a restrictive covenant must be:

1. ancillary to either a sales agreement or an employment agreement,

2. supported by adequate consideration,

3. reasonable in geographic and temporal scope, and

4. necessary to protect the employer's legitimate business interest.

*See Applied Micro, Inc. v. SJI Fulfillment, Inc.*, 941 F.Supp. 750, 753 (N.D.Ill.1996); *The Loewen Group Int'l, Inc. v. Haberichter*, 912 F.Supp. 388, 392 (N.D.Ill.1996).

 Before this Court even begins to analyze these criteria, however, this Court must examine whether APAC has made the necessary showing to prove that McRae's new position at Access Direct calls his covenant not to compete into question: that is, whether McRae's new job is similar in capacity to his former job at APAC, or whether he is likely to disclose APAC's proprietary information or client information to Access Direct. If APAC fails to prove that either of these two situations exist, it is unnecessary for this Court to examine whether APAC has otherwise proven each of the next four criteria.

#### (i) Whether McRae's new job at Access Direct is similar to his old job at APAC

At first blush, McRae's new job does not appear to be similar to his old job: an information technology position where he was primarily responsible for outbound services is different from an operations position where he is exclusively responsible for inbound services. The thrust of APAC's argument is not that the two jobs are similar, however. APAC basically asserts that it does not matter whether the literal description of the two jobs is similar, because McRae cannot be trusted to do the job that he says he is going to do.

To prove that McRae is untrustworthy, APAC cites several examples of outright lies

that McRae told Access Direct while he was negotiating for his new job, such as telling Access Direct that he was making $120,000 and had three weeks of vacation per year at APAC, when none of these alleged "facts" were true.

In response, Thomas Cardella, who is both Chief Executive Officer of Access Direct and the person who hired McRae, admits that McRae was deceitful during his negotiations with Access Direct. McRae misrepresented his vacation time (and possibly his salary) when negotiating for a job with Access Direct, and McRae originally told Cardella that McRae had not signed a noncompetition agreement at APAC, but Cardella later learned that McRae had signed such a document. Additionally, McRae failed to tell Cardella that three days after McRae had signed his contract with Access Direct, APAC promoted him to Director of Professional Services and Consulting, and that McRae attended a meeting accepting that position, even though he had already signed a contract to leave APAC to work for Access Direct.[4]

Besides lying to Cardella, several APAC employees also testified that when McRae left APAC he told them that he was becoming Chief Information Officer of Access Direct. In contrast, both Cardella and McRae testified that McRae had never even been offered that position. Cardella explained that he had agreed to include a provision in McRae's contract in which he would "career path" McRae into a position as Chief Information Officer, but once Cardella discovered that McRae had signed a covenant not compete when he worked at APAC, Cardella pulled McRae aside and said that he could not "career path" McRae into such a position, so they removed that clause from McRae's contract.

This Court finds credible the testimony that APAC has presented about McRae's deceit in his contract negotiations with Access Direct. McRae told several lies and failed to disclose pertinent information when he was negotiating for his new job. This Court also finds it credible that after McRae had accepted a job at Access Direct, McRae told several APAC employees that he was going to become Access Direct's Chief Information Officer.

Having proven these facts, APAC next argues that these facts show that Access Direct actually hired McRae to work as Chief Information Officer, but later changed his job title to Vice–President of Inbound in order to avoid litigation. As further evidence, APAC argues that it is incredible to believe that Access Direct hired McRae at a salary of $90,000 per year to be Vice–President of Inbound operations, when McRae has very limited experience in operations. APAC thereby asserts that this Court should enjoin McRae from working in any capacity with Access Direct because it is unbelievable that McRae is really doing the job that he says he is doing.

Although APAC has shown that McRae was deceitful during his negotiations with both Access Direct and APAC, APAC has not presented sufficient evidence to prove that Access Direct was in any way complicit in that deceit, or that Access Direct actually hired McRae as anything but Vice–President of Inbound. McRae lied to Access Direct almost as much as he lied to APAC, and while it may be true that McRae told APAC colleagues that he was becoming Chief Information Officer at Access Direct, this Court finds that Access Direct neither hired nor intended to hire McRae as its CIO. Whatever McRae said to former colleagues about taking a job as CIO was simply "puffing" to make it seem as if he was getting a better job than he was. Cardella had agreed to "career path" McRae into a position as Chief Information Officer, but Cardella did not hire McRae into such a position. McRae loosely interpreted Cardella's contractual promise (which was later removed) that he might *someday* become CIO to say that he *was taking a job* as CIO, because McRae knew that the CIO title would sound impressive to his former coworkers.

4. Not only did McRae fail to disclose this information to Cardella before he began his first day of work at Access Direct, but Cardella testified at the hearing on this motion that McRae's admission of this fact during his direct examination by APAC was the first time that Cardella had become aware of it.

The testimony of APAC's own employee in charge of Inbound operations bolsters Access Direct's credibility in asserting that Access Direct did in fact hire McRae as Vice–President of Inbound, even though he had little Inbound operations experience. Raymond Zukowski testified that he is currently in charge of APAC's Inbound department. He began his career as a stockbroker, but left stockbroking to run customer service operations at General Electric, which included both inbound and outbound services. Although Zukowski had obtained operations experience by the time he began to work for APAC, when he stepped into his first operations job at GE, his main experience was that of a stockbroker; he had little (if any) operations expertise in inbound and outbound telemarketing.

In short, while this Court could use McRae's untrustworthiness in his negotiations to disbelieve McRae's testimony that he is not actually going to work as Vice–President of Inbound for Access Direct, this Court declines to do so.[5] McRae lied about his salary and vacation to land a good job with Access Direct, and he wanted to "career path" into a position as Chief Information Officer, but the Court is not convinced that APAC will ultimately succeed in proving that Access Direct hired McRae as anything but Vice–President of Inbound, working in an operations position. Nor is this Court convinced that Access Direct is scheming to employ McRae under a pseudo-job description in order to capitalize on whatever proprietary technological information that McRae may know. APAC is understandably upset with McRae for lying to it and for deserting APAC to work for its competitor, but McRae's job at Access Direct is in a different capacity than what he was doing at APAC.

### (ii) Whether disclosure of trade secrets is likely

Even if McRae's job at Access Direct is in a different capacity than what he was doing at his former job, APAC could still prove that McRae violated the noncompetition agreement by showing that in his new job, it is likely that he will disclose APAC's proprietary or client information. See Restrictive Covenant Agreement, Pl.'s Ex. 5, Dep. Ex. 8, ¶ 4 ("Employee covenants that ... [he] shall not ... assist anyone in the conduct of a business competitive with that of Employer in which Employee is in ... a capacity in which it is likely that Employee will disclose Employer's Proprietary Information or Client Information"). APAC argues that McRae's job will inevitably lead to such disclosure,[6] while the defendants assert that it will not.

The main case that APAC relies upon to support its position that McRae's untrustworthiness alone is enough to find that he will inevitably disclose trade secrets is *PepsiCo, Inc. v. Redmond*, 54 F.3d 1262 (7th Cir.1995)(affirming district court's preliminary injunction which, *inter alia*, enjoined Redmond from working in specific departments at Quaker for a limited time period).[7]

**5.** APAC relies heavily on *PepsiCo, Inc. v. Redmond*, 54 F.3d 1262 (7th Cir.1995) to develop its argument that McRae's untrustworthiness is a compelling reason to enjoin him from working in any capacity for Access Direct. Because this Court discusses the *PepsiCo* decision in detail in the next section, this Court does not analyze *PepsiCo* here. See discussion, *infra*.

**6.** APAC did not specifically brief this point when it analyzed the applicable law affecting the restrictive covenant. See APAC Teleservices, Inc.'s Brief Regarding Applicable Law, Doc. # 18. Instead, APAC assumed that McRae had violated either subsection (i) or (ii) of the restrictive covenant, and that the sole issue before this Court was whether the restrictive covenant was enforceable. To this end, APAC analyzed the four criteria that Illinois courts use to decide whether a restrictive covenant is enforceable, not whether McRae would be "likely to disclose" confidential information.

In APAC's analysis of the trade secret misappropriation claim, as well as in its Post–Hearing Brief (*see* Docs. # 18, 25), APAC argued that McRae will "inevitably" disclose trade secrets if he works for Access Direct. This Court has read that argument broadly in order to decide whether the analysis supports APAC's claim that McRae violated the noncompetition agreement because he is "likely" to disclose proprietary information. This Court has therefore assumed for the purposes of this analysis that "likely to disclose" is the same as "inevitably will disclose."

**7.** In *PepsiCo*, a former managerial employee named Redmond left Pepsico to work for Quaker Oats. 54 F.3d at 1264. Pepsico and Quaker are

In *PepsiCo,* an Illinois district court did indeed note that a former employee's "lack of forthrightness on some occasions, and out and out lies on others" could be sufficient to conclude that a threatened use of the former employer's secrets existed, and that a preliminary injunction was necessary. *PepsiCo, Inc. v. Redmond,* 1996 WL 3965, at *31 (N.D.Ill.1996)(unreported case) (permanent injunction, mostly adopting text from preliminary injunction); *PepsiCo, Inc. v. Redmond,* 54 F.3d 1262 (7th Cir.1995)(affirming preliminary injunction). While the district court noted that a defendant's lack of trustworthiness on previous occasions could have been enough to conclude that a threatened use of the plaintiff's secrets existed, previous untrustworthiness does not compel that result. Ultimately, the district court has discretion to decide whether the defendant's previous untrustworthiness warrants an injunction to enjoin him from working for the new employer because he cannot be trusted to refrain from disclosing the former employer's confidential information and trade secrets. *See PepsiCo,* 54 F.3d at 1270 ("The facts of the case do not ineluctably dictate the district court's conclusion. Redmond's ambiguous behavior toward his Pepsico superiors might have been nothing more than an attempt to gain leverage in employment negotiations.... Nonetheless, the district court, after listening to the witness, determined otherwise. That conclusion was not an abuse of discretion.")

In affirming the district court's decision, the Seventh Circuit noted that Pepsico was likely to prevail on its statutory trade secret misappropriation claim because of the combination of "the demonstrated inevitability that Redmond would rely on ... trade secrets in his new job [and] the district court's reluctance to believe that Redmond would refrain from disclosing these trade secrets in his new position (or that Quaker would ensure that

Redmond did not disclose them)." 54 F.3d at 1271. Here, APAC has not succeeded in showing that such a combination exists. Even though APAC has demonstrated that McRae was deceitful in negotiating his job with Access Direct, APAC has failed to show any inevitability that McRae will rely on APAC trade secrets in his new job, that McRae will disclose trade secrets in his new position, or that Access Direct will allow McRae to disclose them.

Moreover, even though the *PepsiCo* district court felt that Redmond might inevitably disclose information, it did not enjoin Redmond from working in any capacity whatsoever with Quaker. Instead, the court enjoined Redmond from assuming any duties related to beverage pricing, marketing, and distribution—the areas with which Redmond had been most intimately involved when he worked at Pepsico. Here, APAC asks this Court to enjoin McRae from working in any capacity at all for Access Direct, even though all of McRae's work at APAC was in information technology, and even though McRae was primarily focused on APAC's outbound department and had minimal exposure to APAC's inbound department.

Another important difference between *PepsiCo* and this case is that Redmond conceded that his new position at Quaker might present him with a decision that could be influenced by certain confidential information that he obtained while working for Pepsico. 1996 WL 3965, * 4. In contrast, both McRae and Access Direct maintain that McRae's new position will not force him to disclose confidential information, and that the proprietary information that McRae knows is so specifically tailored to APAC that it is not even useful to Access Direct.

And last, it is noteworthy that the Seventh Circuit Court of Appeals refused to consider Pepsico's argument that Quaker "may well

competitors in the "sports drinks" and "new age drinks" market. At Pepsico, Redmond had been General Manager of the business unit for all of California, a unit which had annual revenues of over 500 million dollars a year, and which represented twenty percent of Pepsico's profit for all of the United States. Redmond's high level position at Pepsico had made him privy to inside information and trade secrets, and he had inti-

mate knowledge of Pepsico's plans for 1995, which was the year that both companies considered an especially important year for their products. At Quaker, Redmond accepted the position of Vice-President of Field Operations for Gatorade, then told Pepsico that he had been offered the position of Chief Operating Officer of the combined Gatorade and Snapple Company. *Id.* at 1264–65.

misappropriate its new, trade-secret distribution system because Snapple has a similar system and Quaker is not familiar with it." *PepsiCo,* 54 F.3d at 1270 n. 8. The Seventh Circuit found such an argument "the sort of speculation" it had rejected in previous cases and declined to examine its validity because it was not central to Pepsico's case. *Id.* Similarly, this Court finds speculative the idea that Access Direct hired McRae in hopes of copying APAC's inbound system. There is insufficient evidence to conclude that Access Direct would want to set up an inbound system like APAC's, or that McRae even knows enough about APAC's inbound system to be able to model Access Direct's system after APAC's. For all of these reasons, this Court finds the facts in *PepsiCo* dissimilar from the case at hand.

In addition to *PepsiCo,* APAC cites three Iowa cases to support its position: *Diversified Fastening Systems, Inc. v. Rogge,* 786 F.Supp. 1486 (N.D.Iowa 1991); *Norand Corp. v. Parkin,* 785 F.Supp. 1353 (N.D.Iowa 1990); and *Uncle B's Bakery, Inc. v. O'Rourke,* 920 F.Supp. 1405 (N.D.Iowa 1996). While the departing employees in these cases were indeed enjoined from working with a competitor company because the courts found disclosure of proprietary information inevitable, these cases, like *PepsiCo,* are not persuasively similar to McRae's situation.

In *Norand,* the district court found inevitable disclosure after the defendant "announced his intention to resign his position . . . with plaintiff and to take a similar position with [a competitor company]." 785 F.Supp. at 1355. In contrast, this Court has found that APAC is not likely to prove its claim that McRae's job at Access Direct is similar to the job he held at APAC. In *Diversified Fastening,* the plaintiff's former director was enjoined from working with the competitor defendant, but the former manager was not. 786 F.Supp. at 1494–95. In finding that the director would inevitably disclose information and must therefore be enjoined from working with the competitor, the court noted that the director had detailed knowledge and that before he left the plaintiff company he had made copies of business cards, had taken rejected products from the plaintiff's manufacturing plant, had asked someone to compile a list of the plaintiff's top twenty-six sales people, and might have even copied shipment information. 786 F.Supp. at 1488. Here, APAC has provided no evidence that McRae was stockpiling information to disclose to Access Direct.

And last, in *Uncle B's Bakery,* the court found disclosure inevitable after noting that "the secret or confidential information from Uncle B's Bakery known to [the former employee] covers every aspect of Uncle B's Bakery operations, and is far more extensive than the body of 'secret' information known to the defendant employees enjoined from employment with competitors in any decision of the Iowa Supreme Court of which this court is aware." 920 F.Supp. at 1436. Unlike the departing employee in *Uncle B's Bakery,* McRae was not privy to such extensive information about every aspect of APAC's operations. His information base was much more narrow and restricted: he had detailed information about one specific project, the ATP Platform for AT & T, and that project was confined to the outbound telemarketing division. He also worked with CTI on the inbound side, but APAC has not proven that any information McRae derived from that work will inevitably be disclosed to Access Direct, or that such information is even that useful to Access Direct.

What appears most useful about McRae's experience with CTI on the inbound side is that he became familiar with various off-the-shelf products that are currently available on the market. As will be discussed *infra,* McRae would violate both the noncompetition covenant and the nondisclosure agreement if he used his technological knowledge to modify these off-the-shelf products to meet the needs of Access Direct's Inbound operation, but that is not what his job at Access Direct entails. In McRae's new job, he will simply tell the IT department at Access Direct what his department needs, and the IT department will have total responsibility to design the solution. While his knowledge of available off-the-shelf products may make him more articulate in expressing his needs to the IT department, ultimately

the technological solution will be in someone else's hands.[8]

Having found that APAC has not proven that a threat of inevitable disclosure exists or that McRae's job responsibilities at Access Direct are in a similar capacity to his former job, APAC is not likely to succeed in proving that the covenant not to compete should be enforced. This Court therefore declines to examine the four criteria relevant to the enforceability of the covenant not to compete, because McRae's position at Access Direct does not violate either the "similar capacity" or "likely to disclose" subsections which are necessary to trigger such an analysis.[9]

### b. Nondisclosure Claim: Trade Secrets and the Nondisclosure Agreement

At the hearing on this motion for preliminary injunction, McRae stated that to the extent that he has knowledge of information that would be subject to the nondisclosure agreement, he has honored and will continue to honor the nondisclosure agreement. McRae also agreed that the design of the ATP G–Prime Project is proprietary to APAC. The issue this Court must therefore resolve is whether APAC is likely to prove that the nondisclosure agreement covers any information besides the design of the ATP G–Prime Project.

The nondisclosure agreement at issue in this case reads, in pertinent part:

CONFIDENTIAL INFORMATION. Employee recognizes and acknowledges that the information, including, but not limited to trade secrets, technical data, marketing techniques, human resources and training materials ... and methods of doing business ... are valuable and unique assets. Employee will not (except as required in the course of employment), during the term of this Agreement or anytime thereafter, for any reason, use or disclose to any person, firm, corporation, association, or any other entity any such information, including but not limited to trade secrets [etc.], for any reason or purpose whatsoever....

CUSTOMERS. During the term of this Agreement ... and for a period of eighteen (18) months thereafter, Employee will not, directly or indirectly ... offer or provide to any person, firm, corporation, association or any other entity, which is or had been a customer of APAC Teleservices, any products or services which are or had been provided by APAC Teleservices or

8. The cross-examination of Jeff Miller, the director of the ATP Platform at APAC, illustrates this point:

Q: When you talked about taking the software or the package off the shelf and you could buy that and then it had to be tailored, in doing that tailoring, would you call Mr. Zukowski and ask him to do the tailoring that needed to be done for the design aspects of it?

A: No, I would not.

Q: Isn't he the vice-president of inbound operations for APAC?

A: I believe that's correct.

Q: And he wouldn't have anything to do with that kind of operation?

A: His organization would give us the business rules of which (sic) to tailor the software, but he would not do the tailoring himself.

Q: IT would do the tailoring?

A: That is correct.

Q: So if Mr. McRae was vice-president of inbound, you wouldn't expect him to do the tailoring, would you?

A: No, I would not.

9. While not dispositive, this Court has also considered the fact that McRae had worked at APAC as a full-time employee since January 1997, doing essentially the same duties until he left in September 1997, and that APAC did not ask him to sign a noncompetition agreement until April 1997. According to APAC's attorney, Walter Lipsman, employees are asked to sign restrictive covenants such as the one McRae signed when they receive a stock option grant of a thousand shares or more. Lipsman further testified that if McRae had refused to sign the original one thousand option stock offer (and thus had not signed the accompanying restrictive covenant agreement connected to that stock option), McRae would not have been fired because of it. See also Complaint ¶¶ 18–19.

Based on these facts, it appears that the stock options, and not any knowledge of trade secrets that McRae might have had, precipitated APAC's desire to have McRae sign the noncompetition agreement. In light of this, the argument that APAC asked McRae to sign the competition agreement in order to safeguard trade secrets and confidential information seems somewhat disingenuous.

which are similar to or competitive with such products or services. . . .

Pl.'s Ex. 2, Dep. Ex. 5, at 1.

■ Whether or not any information that McRae knew constitutes a trade secret is a mixed question of law and fact. *Economy Roofing & Insulating v. Zumaris,* 538 N.W.2d 641, 648 (Iowa 1995). The legal aspect of this question is whether the information could have constituted a trade secret under the first part of the definition in Iowa Code § 550.2(4). In *Economy Roofing,* the Iowa Supreme Court explained the definition of "trade secret" under Iowa Code § 550.2(4):

> Under the plain language of [Iowa Code section 550.2(4)], "trade secret" is defined as "information" and eight examples of this term are provided. Although these examples cover items normally associated with the production of goods, "trade secrets" are not limited to the listed examples. . . . One commentator explains:
>
>> Trade secrets can range from customer information to financial information, to information about manufacturing processes to the composition of products. There is virtually no category of information that cannot, as long as the information is protected from disclosure to the public, constitute a trade secret.
>
> We believe that a broad range of business data and facts which, if kept secret, provide the holder with an economic advantage over competitors or others, qualify as trade secrets. *US West Communications, Inc. v. Office of Consumer Advocate,* 498 N.W.2d 711, 714 (Iowa 1993) (citations omitted).

*Economy Roofing,* 538 N.W.2d at 646–47.

■ After determining the legal aspect of this mixed-fact-and-law question by deciding whether the information fits the definition provided in § 550.2(4), the factual aspect of the question arises from the remaining part of the definition of trade secret found in subsections (a) and (b) of § 550.2(4). *Id.* at 648–49. The Court must decide whether the information is both of the following:

> a. Derives independent economic value, actual or potential, from not being general-

ly known to, and not being readily ascertainable by proper means by a person able to obtain economic value from its disclosure or use.

> b. Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

*See Economy Roofing,* 538 N.W.2d at 649. Thus there are two factual prongs to any trade secret action: independent economic value and reasonable efforts to maintain secrecy. For the economic value prong, "economic value" has been further defined as "information kept secret that would be useful to a competitor and require cost, time and effort to duplicate. . . ." *US West,* 498 N.W.2d at 714. Under the secrecy prong, the Iowa Supreme Court has specified that the key to this inquiry is the phrase "reasonable under the circumstances." *See 205 Corp. v. Brandow,* 517 N.W.2d 548, 551 (Iowa 1994).

■ With these legal and factual standards in mind, the Court has examined each of the plaintiff's purported trade secrets. (*See* Pl.'s Post–Hearing Brief, Doc. # 25.) The following list contains the purported trade secrets that APAC is most likely to prove constitute protected trade secrets because they pass both the legal and factual inquiries:

(1) Design and other proprietary information about the ATP G–Prime Project for AT & T;

(2) APAC's future business direction—e.g., the development and introduction of the Consulting and Professional Services division that McRae developed and that McRae was going to direct;

(3) All proprietary programming and configuration of off-the-shelf products that McRae programmed or configured, or assisted in programming or configuring, or otherwise supervised or participated (in any capacity) while working for APAC as either a consultant or full-time employee;

(4) Knowledge of the architecture for and portfolio of hardware, network, applications, and development that APAC has used, is currently using, or has recently acquired, and what kind of architecture for

and portfolio of hardware, network, applications, and development that APAC intends to use in the future to remain competitive; and

(5) Any specific programming, design, or other proprietary work McRae did to tailor CTI to the specific needs of clients (e.g., Comp–U–Serve) when he worked on inbound or outbound projects for APAC.

Legally, APAC is most likely to prove that the above-listed items are trade secrets because these items fit the statutory list of trade secrets as defined in Iowa Code § 550.2(4). Factually, APAC is likely to be able to show that it derives independent economic value from these secrets because the confidential programming codes, designs, and future business direction are unknown to, and not readily ascertainable by, Access Direct. *See 205 Corp.*, 517 N.W.2d at 550. In addition, APAC's requirement that all new employees sign the nondisclosure agreement during their orientation session, and McRae's acquiescence in signing the agreement during his orientation, constitute a "reasonable effort under the circumstances" to protect the secrecy of these trade secrets. Accordingly, this Court finds that for the ·purposes of this preliminary injunction, the above-listed trade secrets are protected by the nondisclosure agreement.[10]

 The purported trade secrets which APAC is unlikely to prevail on the merits of proving to be protected trade secrets, and which this Court does not recognize as protected trade secrets for purposes of this preliminary injunction,[11] are the following:

(1) McRae's professional knowledge of how to adapt off-the-shelf products to meet specific needs, insofar as that skill might be applicable to his position in Operations;

(2) McRae's general knowledge and skill of how to overcome obstacles and "engineer blind alleys", insofar as that skill might be applicable to his position in Operations;

(3) The general knowledge base that McRae has acquired of different products that are currently available on the market;

(4) General knowledge of APAC's strategy for bringing new products to market; and

(5) General knowledge of how APAC proposes to clients.

Even if this list passed the legal analysis by fitting the statutory definition of trade secrets under Iowa Code § 550.2(4), it would not pass the factual analysis. Most importantly, APAC has failed to show that it derived economic value because these items were unknown to, and not readily ascertainable by, another corporation who would profit from their disclosure and use. *See 205 Corp.*, 517 N.W.2d at 550. For example, APAC has failed to show that Access Direct's IT department does not know what off-the-shelf products are available and which products are superior to others. Additionally, even if Access Direct's IT department did not already know what products were available, APAC has failed to show that this information is not "readily ascertainable." Similarly, APAC has failed to show that Access Direct's IT department does not have the professional know-how to be able to tailor off-the-shelf products to meet its own clients' needs, or that McRae's ability to "overcome obstacles and engineer blind alleys" is proprietary, especially because his job at Access Direct does not allow him to tailor off-the-shelf products to meet clients' needs.

### c. Summary

The bottom line is that McRae left a technical position in information technology at APAC to assume an operations position for a competitor company. Although McRae lied to both APAC and Access Direct in order to negotiate a good job at Access Direct, APAC has not demonstrated a probability of success on the merits that either (1) McRae or Access Direct is lying about the job responsibilities that McRae's new position at Access Direct entails, or that (2) McRae's new posi-

---

**10.** A court's determination that information is or is not a trade secret in the course of a preliminary injunction hearing is not a "final" determination on the merits of the question, and such a determination does not remove the issue from

contention at a trial on the merits. *See Economy Roofing*, 538 N.W.2d at 648 (citing cases).

**11.** See footnote 10, *supra.*

tion will inevitably lead him to disclose proprietary or confidential information.

In contrast, APAC has demonstrated a probability of success on the merits that McRae has knowledge of some APAC trade secrets and that those secrets are protected by the nondisclosure agreement. This Court believes that enforcement of the nondisclosure agreement is sufficient to protect APAC's trade secrets, and that McRae's knowledge of APAC trade secrets does not provide a sufficient basis for enjoining him from working for Access Direct.

### 2. Irreparable Harm to APAC

The Court next analyzes the degree of harm, if any, that APAC would suffer if not granted a preliminary injunction. In the Eighth Circuit, the party moving for a preliminary injunction can show irreparable harm by showing that the movant has no adequate remedy at law. *Baker Elec. Co-op.*, 28 F.3d at 1473; *Frank B. Hall & Co. v. Alexander & Alexander, Inc.*, 974 F.2d 1020, 1025 (8th Cir.1992). Conversely, proof of the existence of an adequate legal remedy, such as a damages claim, supports an inference of the absence of irreparable harm. *Moore Business Forms, Inc. v. Wilson*, 953 F.Supp. 1056, 1062 (N.D.Iowa), *aff'd*, 105 F.3d 663 (8th Cir.1996). Even if a valid damages claim is available, however, it does not necessarily preclude the issuance of a preliminary injunction because money damages may not fully compensate a movant's less tangible injuries. *Id., see also Curtis 1000*, 878 F.Supp. at 1245–48 (citing cases).

Here, the restrictive covenant agreement which contains the noncompetition clause specifies that a "breach of these restrictions will irreparably and continually damage Employer for which money damages may not be adequate." Pl.'s Ex. 5, Dep. Ex. 8, ¶ 8(b). Although a violation of the restrictive covenant could thus constitute irreparable harm, *see, e.g., Curtis 1000*, 878 F.Supp. at 1248, *citing Overholt Crop. Ins. Serv. Co. v. Travis*, 941 F.2d 1361, 1371 (8th Cir.1991), because APAC is not likely to succeed in showing—and has not shown for the purposes of this preliminary injunction—that McRae's position as Vice–President of Inbound violates the noncompetition agreement, APAC has not been irreparably harmed.

Next, the remedies specified in the nondisclosure agreement are as follows:

REMEDIES. If Employee shall breach or fail to perform any term, condition or duty in this Agreement required to be observed or performed by Employee, then in such event, APAC Teleservices shall be entitled to institute and prosecute proceedings in any court of competent jurisdiction, either in law or in equity, to obtain damages for any breach of this Agreement, or to enforce the specific performance thereof by Employee, or to enjoin Employee from committing any breach of this Agreement, but nothing herein contained shall be construed to prevent APAC Teleservices from seeking such other remedy, in the courts, in case of any breach of this Agreement by Employee, as APAC Teleservices may elect and invoke.

Pl.'s Ex. 2, Dep. Ex. 5, at 2. Although the language in this remedies clause does not specifically state that breach of the nondisclosure clause will cause irreparable harm to APAC, the defendants have not argued that a valid breach of the nondisclosure agreement would not irreparably harm APAC. Instead, the defendants assert that because McRae will guard the few trade secrets that he knows by adhering to the nondisclosure clause, APAC will not be irreparably harmed.

Having already found a substantial likelihood that APAC will prevail in showing that McRae does have knowledge of some APAC trade secrets, this Court is cognizant of the fact that the disclosure of even a single trade secret could be enough to cause APAC irreparable harm. *See Union Carbide Corp. v. UGI Corp.*, 731 F.2d 1186, 1191–92 (5th Cir. 1984). One of the reasons why the disclosure of a single trade secret could cause irreparable harm is that once a trade secret is disclosed, its secrecy is lost forever. *See FMC Corp. v. Taiwan Tainan Giant Indus. Co. Ltd.*, 730 F.2d 61, 63 (2nd Cir.1984). Similarly, the harm of threatened disclosure of trade secrets is irreparable because once trade secrets are disclosed, there is virtually no way to measure the impact of that disclosure on

subsequent sales or business. *PepsiCo,* 1996 WL 3965, at *30.

■ Because McRae does know some APAC trade secrets, a preliminary injunction enforcing the nondisclosure agreement with respect to those secrets is necessary to protect APAC from the irreparable harm that would occur if McRae disclosed those secrets to Access Direct. Provided that McRae complies with the nondisclosure agreement, which this Court believes he will, allowing McRae to work for Access Direct as Vice–President of Inbound during the pendency of this litigation would not irreparably harm APAC.[12]

### 3. Balance of Harms

#### a. Nondisclosure Agreement

To the extent that this Court has found that APAC is likely to prevail in showing that McRae does have knowledge of some trade secrets and that those trade secrets must be protected by the nondisclosure agreement, this Court has found that APAC would likely suffer irreparable harm if those trade secrets were disclosed.

Because McRae willingly "reaffirmed" the nondisclosure agreement when he testified at the hearing on this motion (*see* Post–Hearing Brf. of Defs., at 5–6), this Court finds that McRae would not be severely harmed—if harmed at all—by enforcement of the nondisclosure agreement.

#### b. Restrictive Covenant Not to Compete

This Court has found that APAC will not suffer irreparable harm by McRae's working as Vice–President of Inbound for APAC (as explained above). In contrast, if APAC's motion to enforce the noncompete agreement were granted, the Court would enjoin McRae from working in any capacity at all at Access Direct during the pendency of this litigation. At the least, an employee forced to undertake another job search must experience the

trials and tribulations that such a search entails, even if the search is ultimately brief.

This Court has no reason to question whether McRae is readily employable, and in the unlikely event that a trial on the merits results in enforcement of the noncompete agreement, he may eventually have to use his employability to find another job. For the pendency of this litigation, however, this Court is not persuaded that the balance of harms tips in APAC's favor, especially because McRae is working in a different capacity than he did at APAC, and because enforcement of the nondisclosure agreement adequately safeguards APAC's interests.

### 4. Public Interest

■ When determining whether public interest prevents enforcement of a restrictive covenant not to compete, Illinois courts seek to ensure that the former employee's products or services will continue to be available to the public. *Gillespie v. Carbondale and Marion Eye Centers, Ltd.,* 251 Ill. App.3d 625, 190 Ill.Dec. 950, 952, 622 N.E.2d 1267, 1269 (1993). Where the general public is free to do business with a large number of other competitors, enforcement of the non-competition agreement does not necessarily violate public interest. *Abbott–Interfast Corp. v. Harkabus,* 250 Ill.App.3d 13, 189 Ill.Dec. 288, 294, 619 N.E.2d 1337, 1343 (1993); *Howard Johnson & Co. v. Feinstein,* 241 Ill.App.3d 828, 182 Ill.Dec. 396, 401–02, 609 N.E.2d 930, 935–36 (1993). At the same time, the public has an interest in ensuring business competition that keeps prices low and quality high. *See generally Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.,* 509 U.S. 209, 113 S.Ct. 2578, 125 L.Ed.2d 168 (1993). Here, testimony established that although APAC and Access Direct are not the sole competitors in this particular field, they are two major competitors. The public has an interest in ensuring

---

**12.** As Judge Learned Hand observed in *Harley & Lund Corp. v. Murray Rubber Co.,* 31 F.2d 932 (2nd Cir.1929), *cert. denied,* 279 U.S. 872, 49 S.Ct. 513, 73 L.Ed. 1007 (1929), "... [I]t has never been thought actionable to take away another's employee, when the defendant wants to use him in his own business, however much the

plaintiff may suffer. It is difficult to see how servants could get the full value of their services on any other terms; time creates no prescriptive right in other men's labor. If an employer expects so much, he must secure it by contract." 31 F.2d at 934.

that both APAC and Access Direct continue to compete in order to ensure that neither company monopolizes the market, and that their prices and services remain competitive. To this end, the public has an interest in ensuring the free movement of employees from one company to the other in order to hone competition, provided the employee's move does not violate a noncompetition or nondisclosure agreement. *See generally AMP Inc. v. Fleischhacker*, 823 F.2d 1199, 1204 (7th Cir.1987)("Any other result would severely impede employee mobility and undermine the competitive basis of our free economy."). At the same time, the public also has an interest in attracting lucrative and growing technology-based companies to locate their businesses in the community, especially when those businesses employ many people.

When determining the public's interest in enforcing a nondisclosure agreement, Iowa courts have recognized that the public interest is served by preventing the unauthorized disclosure of trade secrets. *Diversified Fastening*, 786 F.Supp. at 1493. Because this Court has found that McRae does have knowledge of some APAC trade secrets, the public interest would best be served by protecting disclosure of those secrets by enforcing the nondisclosure agreement.

 Accordingly, the public interest is best served by allowing McRae to work as Vice–President of Inbound for Access Direct during the pendency of this litigation, provided that he agrees to abide by the nondisclosure agreement to protect the specific trade secrets this Court has listed *supra*.

### D. Conclusions

Based on all of the evidence before it, this Court concludes that McRae has not disclosed or misrepresented any trade secrets or proprietary information at this point in time. This Court also finds that McRae can fulfill his employment obligations at Access Direct as Vice–President of Inbound while also abiding by the nondisclosure agreement, that Access Direct does not intend to elicit secret information from McRae, and that any trade secrets that McRae knows may not even be useful to Access Direct. *See Baxter*

*Int'l*, 976 F.2d at 1194. For these reasons, upholding the nondisclosure agreement will adequately safeguard APAC's interests.

This Court also finds that McRae's position as Vice–President of Inbound Telemarketing operations at Access Direct is in a different capacity than was his former job with APAC, and that his new job is not in a capacity in which it is likely that McRae will disclose APAC's proprietary information or client information. To the extent that McRae has knowledge of APAC trade secrets, those secrets are adequately safeguarded by enforcement of the nondisclosure agreement.

Accordingly, it is **ORDERED:**

APAC's motion for a preliminary injunction shall be denied in part and granted in part.

(1) It shall be DENIED insofar as this Court declines to enjoin McRae from working in any capacity for Access Direct during the pendency of this litigation. McRae can continue to work as Vice–President of Inbound Telemarketing, in the operations division of Access Direct.

(2) It shall be GRANTED as follows. During the pendency of litigation, McRae shall honor the nondisclosure agreement that he signed with APAC Teleservices, Inc., by not disclosing the following information:

(a) Design and other proprietary information about the ATP G–Prime Project for AT & T;

(b) APAC's future business direction— e.g., the development and introduction of the Consulting and Professional Services division that McRae developed and that McRae was going to direct;

(c) All proprietary programming and configuration of off-the-shelf products that McRae programmed or configured, or assisted in programming or configuring, or otherwise supervised or participated in (in any capacity) while working for APAC as either a consultant or employee;

(d) McRae's knowledge of the architecture for and portfolio of hardware, network, applications, and development that APAC has used, is currently using, or has recently acquired;

(e) McRae's knowledge of the architecture for and portfolio of hardware, network, applications, and development that APAC intends to use in the future to remain competitive; and

(f) Any specific programming, design, or other proprietary work McRae did to tailor CTI to the specific needs of clients (e.g., Comp–U–Serve) when he worked on inbound or outbound projects for APAC.

This Court also notes that McRae may use his general knowledge of the availability of different off-the-shelf products and the customization possibilities of those products to articulate the kinds of processes that might be useful in his Inbound department, but McRae can neither customize the off-shelf products, nor instruct the IT personnel in how to customize those products, for a period of twenty-four months from the date that he left APAC.